# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSLVANIA

ROBERT C. ABRAMS, JR. and SONYA M.   :
ABRAMS; JAMES M. ALLEN; THEODORE R.  :
BABCOCK and CONNIE R. BABCOCK; DALE  :
G. BENNETT and DONNA M. BENNETT,      :     **CIVIL ACTION. NO.**
Individually and t/a D+D BENNETT PARTNERS :
LIMITED PARTNERSHIP; THOMAS E.         :
BLANCHARD and MARGARET K.           :
BLANCHARD; WILLIAM T. BOHENSKY, JR.  :
and LAURA G. BOHENSKY; CHARLES W.   :
BROWN, JR.; JAN ROBERT BROWN;       :
MARILYN BRYAN a/k/a MARILYN H.       :
SNYDER BRYAN and THOMAS BRYAN;    :
JOHN BURKE; TY COBB; JACK C.         :
CORBETT and JANICE M. CORBETT; KIM R.  :     **COMPLAINT**
CORBETT  and DEBRA C. JONES; WAYNE M. :
CUMMISKEY and ANDRAE L. CUMMISKEY; :
ROBERTA F. DAVIS; ROBERTA JEAN     :
PENNAY DYER; LYLE R. FENTON; WILLIAM :
DAVID GILBERT and JENNIFER GILBERT;  :
GARY L. HALL; JOSHUA L. HEES and     :
TAMARA O. HEES; RAYMOND HENNINGER, :
JR.; RICHARD R. HIGLEY and CHARLOTTE L.:
HIGLEY; HIGLEY TALL SPRUCE LLC;    :
JEMSCO STAR, LLC; EDWARD S.        :
KALINOWSKY; LYNN H. KINCH and GAIL  :     <u>**Jury Trial Demanded**</u>
GAIL KINCH; MARJORIE E. SNYDER    :
KISNER and JESSE KISNER; ANTHONY J.  :
LATINI and MELISSA L. LATINI;       :
LATINI MANAGEMENT, LLC, t/a LATINI  :
RESOURCES, LP; MICHAEL J. McGROARTY :
a/k/a MICHAEL McGROARTY and      :
MARGARET M. McGROARTY; EDWARD F.  :
McKERNAN; EARL C. MILLER and ANN L.  :
MILLER; RANDY L. MORSE and VIRGINIA K. :
MORSE; GARY R. NORCONK, SHARON M.  :
                               :
[CAPTION CONTINUED ON NEXT PAGE]  :

i

[CAPTION CONTINUED FROM PRIOR PAGE] :

                                            :

NORCONK and LINDA L. KISNER, Individually :
and t/a NORCONK FAMILY LIMITED :
PARTNERSHIP; KEVIN R. POTTER and :
DONNA E. POTTER, Individually and t/a :
K&D ACRES, F.L.P.; RAYMOND J. RAFFIN :
and MARY ANN RAFFIN, Individually and as :
Trustees of THE RAFFIN FAMILY TRUST :
DATED APRIL 10, 2003, and as Trustees of :
THE RAYMOND J. AND MARY ANN RAFFIN :
GAS PROTECTOR TRUST; APRIL A. RINE and :
JEFFREY J. RINE; JOYCE ANN ROHE; :
MELVIN E. ROHE, JR.; MICHAEL B. SAXE, :
Individually and t/a MARCELLUS FIVE :
FAMILY LIMITED PARTNERSHIP; THOMAS :
SCHMECKENBECHER, Individually and t/a :
THOMAS SCHMECKENBECHER FAMILY LP; :
SCOTT R. SHORES and LAURA K. SHORES; :
JAMES SWINGLE, JR. and SUSAN SWINGLE; :
BETTY J. THEM; WILLIAM W. THEM, :
Individually and as Trustee of the WILLIAM W. :
THEM LIVING TRUST; TOWANDA :
COUNTRY CLUB; ROBERT W. WATKINS; :
WICKWARD MANAGEMENT, LLC t/a :
WICKWARD RESOURCES, LP; GARY :
WICKWIRE; SCOTT A. WICKWIRE, :
Individually and t/a WICKWIRE FAMILY :
LIMITED PARTNERSHIP: CHUCK WILL a/k/a :
CHARLES WILL; :

                                            :

                            Plaintiffs, :

           v. :

                                            :

CHESAPEAKE ENERGY CORPORATION; :
CHESAPEAKE APPALACHIA, L.L.C.; :

                                            :

[CAPTION CONTINUED ON NEXT PAGE] :

[CAPTION CONTINUED FROM PRIOR PAGE] :
                                                                  :
CHESAPEAKE ENERGY MARKETING, LLC,  :
as successor by conversion to CHESAPEAKE   :
ENERGY MARKETING, INC.; CHESAPEAKE  :
OPERATING L.L.C., as successor by conversion  :
to CHESAPEAKE OPERATING, INC.;           :
WILLIAMS PARTNERS, L.P., f/k/a              :
ACCESS MIDSTREAM PARTNERS, L.P.;     :
ACCESS MLP OPERATING, L.L.C.;           :
APPALACHIA MIDSTREAM                 :
SERVICES, L.L.C.: ANADARKO              :
PETROLEUM CORPORATION; ANADARKO   :
E&P ONSHORE LLC, as successor by conversion :
to and f/k/a ANADARKO E&P COMPANY LP;  :
STATOIL NATURAL GAS LLC; STATOIL    :
USA ONSHORE PROPERTIES, INC.; and     :
MITSUI E&P USA LLC,                    :
                                                  :
                           Defendants.     :

# <u>TABLE OF CONTENTS</u>

INTRODUCTION…………………………………………………………  1

A.      The Anticompetitive Scheme to Allocate Geographic
        Markets for the Acquisition of Gas Mineral Rights and………………  5
        Operating Rights

B.      The Initial Scheme to Eliminate, Reduce or Restrain
        Competition in the Market for Gas Gathering Services………………  8

C.      The Subsequent Scheme to Transfer, Bolster and Extend the
        Unlawfully Acquired Monopoly on Gas Gathering Services………….  9

D.      The Scheme to Defraud Plaintiffs of Their Royalties by the
        Misrepresentation of Unauthorized or Artificially
        Inflated Deductions……………………………………………………10

E.      The Lessee Defendants' Breaches of Their Express and Implied
        Contractual Obligations to Plaintiffs…………………………………  11

F.      The ProPublica Report……………………………………………..  14

G.      Efforts by State Government Officials to Address the Problem……...  15

JURISDICTION AND VENUE……………………………………………...  19

PARTIES…………………………………………………………………….. 20

A.      Plaintiffs…………………………………………………………. 20

B.      Defendants……………………………………………………..41

## <u>TABLE OF CONTENTS (continued)</u>

FACTUAL BACKGROUND…………………………………………….. 45

A.    The Use of Horizontal Drilling and Hydraulic Fracturing to Produce
      Natural Gas from the Marcellus Shale; the Resulting Need to
      Establish Drilling and Production Units Combining
      Multiple Leaseholds…………………………………………………45

B.    The Natural Gas in Which Plaintiffs Own Royalty Interests
      Is Not In Marketable Form at the Wellhead; To Be Marketable,
      The Gas Must First be Gathered and Transported to Commercial
      Market Hubs or the Locations of Other Markets……………………...46

C.    Chesapeake Pursues a Vertically Integrated, Highly
      Leveraged Business Model…………………………………………....47

D.    Chesapeake Commences Its Land Grab by Acquiring Competitors….. 48

E.    Chesapeake and Anadarko Begin to Compete to Acquire Oil and
      Gas Leases in and Around Bradford County…………………………..49

F.    Anadarko and Chesapeake Enter Into a Joint Exploration
      Agreement and Establish the AMI……………………………………..50

G.    The Anticompetitive Market Allocation Agreement…………………..51

H.    The Joint Venture Between Chesapeake and Statoil…………………..51

I.    Anadarko Enters Into a Joint Venture With Mitsui, and
      Assigns Working Interests in Its Leases to Mitsui E&P……………… 52

J.    Plaintiffs' Royalty Interests……………………………………………52

K.    The Royalty Provisions in Plaintiffs' Leases…………………………..58

L.    The Pooling and Unitization of the Leaseholds and the
      Commencement of Production………………………………………….59

## TABLE OF CONTENTS (continued)

M.    The Royalty Provisions of Plaintiffs' Leases Do Not Permit
      the Lessee Defendants to Deduct Post- Production Costs................  60

N.    Chesapeake Determines the Royalties It Pays to Plaintiffs
      Based on Self-Dealing Transactions.......................................  61

O.    The Lessee Defendants Deducted Arbitrary, Excessive and
      Unreasonable Amounts for Gathering and Other
      Post-Production Services................................................... 64

P.    Chesapeake's Liquidity Crisis............................................. 66

Q.    Chesapeake's Scheme to Use Gas Gathering and
      Related Agreements to Solve Its Liquidity Crisis......................... 67

R.    Defendants Leverage Their Monopoly Power Over
      Gathering and Intrastate Transportation Pipeline
      Systems in Contractually Dedicated Areas to Enable
      Chesapeake to Address Its Liquidity Crisis, and to
      Enable Access Midstream to Generate Supra-Competitive
      Profits, at the Expense of Plaintiffs and
      Other Royalty Interest Owners............................................. 72

FIRST CAUSE OF ACTION
(Agreement to Restrain Competition in Violation of
Section 1 of the Sherman Act, 15 U.S.C. § 1)..................................  82

SECOND CAUSE OF ACTION
(Combination or Conspiracy to Monopolize Trade or
Commerce In Violation of Section 2 of the
Sherman Act, 15 U.S.C. § 2)...................................................  92

THIRD CAUSE OF ACTION
(Violation of RICO, 18 U.S.C. §§ 1961-1968)..................................  96

A.    The Enterprise.............................................................  97

B.    The Pattern of Racketeering Activity...................................... 98

# TABLE OF CONTENTS (continued)

C.      The Predicate Acts of Mail Fraud and Wire Fraud……………………100

D.      RICO Injury to Plaintiffs…………………………………………... 103

FOURTH CAUSE OF ACTION
(Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))………………………....104

FIFTH CAUSE OF ACTION
(Conversion)………………………………………………………………......106

SIXTH CAUSE OF ACTION
(Civil Conspiracy)………………………………………………………………108

SEVENTH CAUSE OF ACTION
(Breach of Contract – Oil and Gas Leases)…………………………………...110

EIGHTH CAUSE OF ACTION
(Action for Accounting)………………………………………………………116

NINTH CAUSE OF ACTION
(Unjust Enrichment)………………………………………………………… 117

PRAYER FOR RELIEF………………………………………………….. 118

DEMAND FOR TRIAL BY JURY………………………………………… 122

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, assert the following claims against the above-named defendants, demanding trial by jury as to all claims which are triable as of right by jury. Plaintiffs make the allegations set forth in this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based in part upon investigation conducted by and through their attorneys.

## INTRODUCTION

1.     Plaintiffs hold royalty and other interests under oil and gas leases with respect to properties located in Bradford County, Pennsylvania, or in nearby townships located in Sullivan, Susquehanna or Wyoming Counties, Pennsylvania.[1] Plaintiffs hold their respective royalty interests either as the original lessee party to a lease or as the assignees of all or part of the right, title and interest of the original lessee party.

2.     Defendant Anadarko E&P Onshore LLC, as successor by conversion to and f/k/a Anadarko E&P Company LP ("Anadarko E&P"), holds, or formerly held, working interests in each of the oil and gas leases under which Plaintiffs hold

---

[1] In the aggregate, the plaintiffs in this action hold royalty interests in connection with the natural gas produced from over 6,000 acres of leasehold land.

their respective royalty interests, as the original lessee party to such leases, or as the assignee or successor of T.S. Calkins & Associates, Inc. ("T.S. Calkins").

3.     One or both of defendants Chesapeake Appalachia, L.L.C. ("Chesapeake Appalachia" or "CALLC"), and Mitsui E&P USA LLC ("Mitsui E&P" and, together with Chesapeake Appalachia and Anadarko E&P, the "Lessee Defendants"), as well as other entities not named as defendants in this action, including in some instances, but not limited to, Statoil USA Onshore Properties, Inc. ("Statoil USA"), also hold working interests in each of the oil and gas leases under which Plaintiffs hold their respective royalty interests, as direct or indirect assignees of Anadarko E&P or T.S. Calkins.

4.     Chesapeake Appalachia, directly or through its affiliate, Chesapeake Operating, L.L.C., also serves as the operator of the working interests in the leases, and of the wells drilled in the drilling and production units established for the exploration, development and production of oil and gas pursuant to the leases in which Plaintiffs hold royalty interests, on behalf of itself, the other Lessee Defendants that hold working interests in the respective leases, and other entities holding working interests in the leases.

5.     Each of the Lessee Defendants is responsible for accounting for and distributing its share of the royalties due and owing to the Plaintiffs who own royalty interests in the leases in which it holds working interests. Chesapeake Appalachia,

on information and belief, also is responsible for accounting for and distributing the royalties due and owing by certain other non-party owners of working interests in the leases in which it holds working interests.

6.    Plaintiffs bring this action to recover the damages that they have sustained, trebled in accordance with law, together with their costs and attorneys' fees, as a result of: (a) an anticompetitive conspiracy among the Defendants to reduce, restrain or eliminate competition for Gas Mineral Rights, Operating Rights and Gathering Services (as defined below) in multiple counties in Northern Pennsylvania, by dividing and allocating the geographic markets for such rights and services among themselves, in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 and 2; and (b) a conspiracy among certain of the Defendants to defraud Plaintiffs and enrich themselves by deducting from Plaintiffs' royalty payments impermissible or artificially inflated purported post-production costs, and by then fraudulently concealing and disguising the true nature of such deductions on Plaintiffs' royalty statements, through a pattern of mail and wire fraud, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, *et seq.*

7.    As a direct and intended result of the anticompetitive conspiracy among the Defendants in violation of the antitrust laws, the bonuses, royalty rates and royalties paid and payable to Plaintiffs were fixed, calculated and paid in amounts

below what they otherwise would have been in a fair and open market. Similarly, the conspiracy to defraud Plaintiffs in violation of RICO resulted in the improper reduction of the royalties payable to Plaintiffs under the guise of legitimacy.

8.     In addition, or in the alternative, Plaintiffs assert supplemental common law claims by which they seek to recover the damages that they have sustained as a result of: (a) breaches by the Lessee Defendants of their respective express and implied contractual obligations under the applicable leases in which they hold or held working interests, by means of the failure to pay or underpayment of royalties due to the wrongful deduction of unauthorized or artificially inflated post-production costs, such as costs for gathering, transportation, compression and/or marketing gas, which have resulting in their failure to pay, or dramatic underpayment of, royalties due and owing to Plaintiffs, in some cases resulting in "negative" royalties due to the deduction of charges in excess of the purported revenues realized or proceeds received for the gas produced; (b) the wrongful conversion by certain of the Defendants of monies due and owing to Plaintiffs; and (c) a civil conspiracy among certain of the Defendants to convert monies due and owing to Plaintiffs. Plaintiffs also separately seek an accounting of the royalties due and owing to them by the Lessee Defendants.

A.     **The Anticompetitive Scheme to Allocate Geographic Markets for the Acquisition of Gas Mineral Rights and Operating Rights**

9.     As alleged in further detail below, the Chesapeake Defendants and the Anadarko Defendants (as defined below), and/or their respective corporate parents or affiliates, with the subsequent financial support and assistance of Mitsui E&P and Statoil USA, all of which otherwise were actual or prospective competitors in the business of natural gas exploration and production, sought to and did divide and allocate between and among themselves and other non-party competitors the geographic markets for Gas Mineral Rights, Operating Rights and Gathering Services (all as defined below), in multiple counties in Northern Pennsylvania, including, but not limited to, all or substantial portions of Bradford County, adjacent portions of Sullivan, Susquehanna and Wyoming Counties, and Lycoming County, with the intent and effect of reducing, restraining or eliminating competition.

10.     The Lessee Defendants and their respective corporate parents and affiliates implemented their scheme by, among other things, entering into a variety of contracts and establishing a variety of relationships, including joint venture agreements, joint exploration agreements, assignments and partial assignments of oil and gas leases, and agreements to exchange oil and gas assets, including the establishment of contractually designated "areas of mutual interest" ("AMI").

11.     Areas of mutual interest, or AMI, are geographic areas established by contract in which two or more oil and gas exploration and production companies

5

have interests. The contract establishing the AMI typically defines the rights that each party does or will have in the area, including the nature and extent of their roles and respective percentage interests, the length of time during which the contract will be in effect, and how the interests of the parties will be implemented.

12.     The Lessee Defendants and other Defendants involved in allocating the market for Gas Mineral Rights intended to and did (i) reduce, restrain or eliminate competition for Gas Mineral Rights, and for the right to operate working interests in oil and gas leases, within the defined AMI; (ii) fix, lower or maintain the price that they had to pay to acquire Gas Mineral Rights (in the form of both initial bonus payments and ongoing royalties) to landowners within the defined AMI; and (iii) enable themselves to then reduce, restrain or eliminate competition in the markets for Operating Rights and Gathering Services in and around the defined AMI.

13.     As a result of the scheme, Chesapeake Appalachia and Anadarko E&P went from being actual or prospective horizontal competitors for Gas Mineral Rights, Operating Rights and Gathering Services, in Bradford County, in surrounding portions of Sullivan, Susquehanna and Wyoming Counties, and in Lycoming County, to being participants in a structured state of competitive détente, in which each of them ceded the right to be the operator of wells and units (and associated gathering systems) in certain counties to the other, while at the same time

obtaining a working interest in the leases, and a non-operating interest in the gathering systems, operated by the other.

14.      Although Anadarko E&P or its predecessor in interest, T.S. Calkins, secured and was sole initial party to numerous other oil and gas leases, in and around Bradford and Sullivan Counties, Anadarko E&P never became the operator of any of the wells drilled or units established pursuant to such leases, or of any of the gathering systems developed to service such wells. To the contrary, as a result of the market allocation scheme, and pursuant to the AMI, Chesapeake Appalachia became the sole operator of all of the wells drilled and units established pursuant to such leases, and Anadarko E&P does not serve as the operator, and has never served as the operator, of any wells or gathering systems in Bradford, Sullivan, Susquehanna or Wyoming Counties.

15.      The results of the successful market allocation scheme can be vividly seen in a map depicted on a slide titled "Northern Tier Drilling", which was included in a presentation by Representative Matt Baker of the 68th District, entitled "The Economic Impact of Marcellus Shale in Bradford and Tioga Counties, Pennsylvania". A copy of the slide is attached hereto as Exhibit A. As indicated on the slide, "Chesapeake Energy is the red wells." As reflected in the map, Chesapeake Energy (directly or through its affiliate Chesapeake Appalachia) is the sole operator

of wells in most of Bradford County, and in much of the surrounding portions of Sullivan, Susquehanna and Wyoming Counties.

16.     As a result of the market allocation scheme, Chesapeake Appalachia effectively became the sole purchaser of Gas Mineral Rights within the defined AMI, which then enabled Chesapeake Energy and its other affiliates to control Operating Rights and Gathering Services in the AMI.

**B.     The Initial Scheme to Eliminate, Reduce or Restrain Competition in the Market for Gas Gathering Services**

17.     As alleged in further detailed below, the same defendants that schemed to allocate the geographic market for Gas Mineral Rights and operating working interests in oil and gas leases, or their respective midstream affiliates, also agreed, combined and conspired to reduce, restrain or eliminate competition in the market for natural gas gathering services, in specified dedicated acreage in Bradford County, adjacent portions of Sullivan, Susquehanna and Wyoming Counties, and Lycoming County, which, on information and belief, overlapped in whole or in part with, or were substantially similar or identical to, the AMI establish as part of the market allocation scheme. The defendants effectively created a monopoly in the market for gathering services in the relevant geographic areas, by and through the use of gathering pipelines in which each of them, directly or indirectly, held, and some or all of them continued to hold, ownership interests.

18.     By eliminating, reducing or restraining competition in the market for natural gas gathering services within the dedicated acreage, the Defendants intended to enable themselves to fix, raise, or maintain, and to charge or benefit from, and then did fix, raise or maintain, and charge or benefit from, supra-competitive fees for gathering services.

19.     The same Defendants involved in the initial scheme to eliminate, reduce or restrain competition in gas gathering services within the dedicated acreage benefited from the supra-competitive prices both (a) through their shared ownership of the gathering pipelines used to provide the gathering services, in proportion to their working interests in the production units serviced by such pipelines, and (b) by passing-on a substantial portion of such supra-competitive fees to Plaintiffs and other owners of royalty interests in oil and gas leases in which such defendants or their affiliates held working interests, by deducting such fees from the royalties payable to Plaintiffs and other royalty interest owners.

### C.     The Subsequent Scheme to Transfer, Bolster and Extend the Unlawfully Acquired Monopoly on Gas Gathering Services

20.     As alleged in further detail below, defendants Chesapeake Energy Corporation ("Chesapeake Energy"), Chesapeake Energy Marketing, Inc. ("CEMI"), Chesapeake Operating, L.L.C. ("Chesapeake Operating"), and Appalachia Midstream Services, L.L.C. ("AMS" and, together with Chesapeake Energy, Chesapeake Appalachia, CEMI and Chesapeake Operation, "Chesapeake"

or the "Chesapeake Defendants"), ultimately agreed, combined and conspired with defendant Williams Partners, L.P., f/k/a Access Midstream Partners, L.P. ("Access"), to transfer to Access, and to bolster and extend, the monopoly on Gathering Services that Chesapeake unlawfully established in designated acreage that substantially coincided with the AMI, to enable Chesapeake to generate funds to stave-off a liquidity crisis that it faced as a result of the excessive debt that it undertook to acquire leases, drill wells and establish gathering systems. The defendants implemented their scheme through a series of complex transactions detailed below which ultimately amounted to the equivalent of a multi-billion dollar an off-balance sheet loan, for which Plaintiffs and other royalty interest owners would end up paying a substantial share of the interest.

**D.   The Scheme to Defraud Plaintiffs of Their Royalties by the Misrepresentation of Unauthorized or Artificially Inflated Deductions**

21.   Finally, certain of the Defendants executed a scheme and artifice to deprive Plaintiffs and other oil and gas lessors who own property within the dedicated acreage of the royalties properly due to them, by means of fraudulent pretenses and representations through the use of the United States mails, in violation of 18 U.S.C. § 1341, and by participating in the conduct of an enterprise through a pattern of racketeering acting, in violation of RICO. In particular, each of the Lessee Defendants issued periodic (usually monthly) royalty statements to Plaintiffs which

concealed and disguised the fact that the Lessee Defendants were deducting from Plaintiffs' royalties impermissible or inflated gas gathering, transportation, and other post-production fees.

**E.    The Lessee Defendants' Breaches of Their Express and Implied Contractual Obligations to Plaintiffs**

22.    Separate and apart from, and in addition to, the schemes described above, the Lessee Defendants also breached the express or implied contractual obligations that they owed to Plaintiffs.

23.    In particular, the Lessee Defendants, acting in violation of their express and/or implied contractual obligations under the terms of the leases under which Plaintiffs hold royalty interests, have failed to pay and underpaid, and continue to fail to pay and underpay, the royalties due and owing by them (and, in the case of Chesapeake Appalachia, by certain other holders of working or overriding interests in the Leases, for which Chesapeake Appalachia is responsible for accounting for and distributing royalties), to Plaintiffs. The underpayment of royalties stems from the conduct of the respective defendants in: (i) basing the royalty payments on artificial gas prices lower than the effective price actually received by them for the gas produced under Plaintiffs' leases; and/or (ii) effectively deducting from Plaintiffs' royalties unauthorized and impermissible amounts for purported post-production costs, such as purported costs of gas gathering, marketing and transportation, in calculating the royalties payable to Plaintiffs, when such costs

were in fact required to transform the gas into marketable form, and did not service to enhance the value of otherwise marketable gas; and (iii) misrepresenting the nature, legitimacy and permissibility of such gas prices and deductions on royalty statements to Plaintiffs.

24.     The use of such artificial prices and expressly prohibited deductions violates the express language of the respective leases, which do not permit the deduction of post-production costs required to transform gas into marketable form in calculating the royalty payable under the leases.

25.     Alternatively, even if the Lessee Defendants otherwise are entitled to deduct or give effect to post-production costs in calculating the royalties payable to Plaintiffs, each of the Lessee Defendants has violated the implied covenants of good faith and fair dealing inherent in the leases under which the Plaintiffs hold royalty interests by deducting, or giving effect to the deduction of, purported post-production costs which were and are arbitrary, grossly excessive and unreasonable in amount.

26.     The arbitrary, excessive and unreasonable deductions for purported gas gathering and transportation costs being deducted in calculating the royalties payable to Plaintiffs are the product and intended result of: (i) an unlawful and anticompetitive contract, combination or conspiracy among Chesapeake, Williams Partners, L.P. f/k/a Access Midstream Partners, L.P. ("Access"), and Access MLP

Operating, L.L.C. ("Access MLP"), to fix, raise, maintain and stabilize the price of gas gathering and intrastate transportation services in the relevant geographic area; (ii) the unlawful attempt by Chesapeake and Access Midstream to monopolize, or the actual unlawful monopolization by them of, the market for gas gathering and intrastate transportation services in the relevant geographic area; and (iii) the accompanying participation by Chesapeake and Access Midstream in a scheme involving the conduct of the affairs of one or more de facto enterprises through what amounted to a pattern of racketeering activity.

27.    The Lessee Defendants provide Plaintiffs with only cryptic, cursory, incomplete and misleading summaries of the deductions taken in calculating their royalties.

28.    Despite extensive efforts and research, Plaintiffs have been unable to obtain copies of many of the key agreements and documents necessary to confirm, understand and allege with particularity operative details of Defendants' schemes. Such documents and information are not publicly filed by the Defendants, but instead are treated as highly confidential trade secrets or business information, and closely guarded by Defendants. As a result, such documents and information are peculiarly within the control of Defendants, and Plaintiffs are unable to plead the specifics of such documents and information without discovery.

### F. The ProPublica Report

29.    As outlined in a March 13, 2014 article published online in *ProPublica,*
entitled *Chesapeake Energy's $5 Billion Shuffle*, available at
http://www.propublica.org/article/chesapeake-energy's-5-billion-shuffle (last
accessed September 10, 2014) (the "ProPublica Report"), Chesapeake conspired
with Access Midstream to accelerate and continue its scheme to extract improperly
inflated royalty deductions from lessors such as Plaintiffs.[2] According to the
*ProPublica* Report, in calculating the royalties payable to lessors, Chesapeake
decided to further artificially inflate the deductions that it took from the proceeds
that it received at the point of sale of the natural gas that it produced from the lessors'
properties in order to enable it to obtain and satisfy what amounted to a $5 billion
off-balance-sheet loan from Access Midstream, disguised as asset sales, to enable
Chesapeake to hide its need to "raise billions of dollars quickly," without alarming
financial markets by the extent of its financial troubles, at a time when it was already
saddled by billions of dollars in debt. *See id.*

---

[2]  According to its website, "*ProPublica* is an independent, non-profit newsroom that produces
investigative journalism in the public interest." http://www.propublica.org/about/. *ProPublica*
was awarded the 2011 Pulitzer Prize for National Reporting and a 2010 Pulitzer Prize for
Investigative Reporting and a Peabody Award (the highest honor in broadcast journalism) in
2013. http://www.propublica.org/awards/. *ProPublica*'s investigative publications have been
cited and relied upon by federal courts when evaluating the sufficiency of plaintiffs' pleadings.
*See, e.g., Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.*, 2011 WL
1335803, at *27 (M.D.Tenn. Mar. 31, 2011). By citing and making certain allegations based on
the *ProPublica* Report, Plaintiffs do not intend to adopt or admit the accuracy of all of the factual
allegations contained in the report.

14

30.     Access Midstream, Chesapeake's co-conspirator, had a strong financial incentive to participate in the scheme. In return for "purchasing" $4.76 billion in gas transportation lines from Chesapeake, Access Midstream was guaranteed to recover $5 billion plus a supra-competitive 15% annual return on its investment over the next decade – a material part of which Access Midstream and Chesapeake knew and intended would come at the expense of royalty interest owners such as Plaintiffs, in the form of artificially and improperly inflated royalty deductions. *See id.*

31.     From the perspective of Access Midstream, the deal terms were highly attractive and favorable. As described by J. Michael Stice, Access Midstream's Chief Executive Officer, "[i]t doesn't get any better than this." *See id.* For Plaintiffs and other lessors to Chesapeake, however, the Chesapeake/Access Midstream deal could hardly get any worse.

### G.     Efforts by State Government Officials to Address the Problem

32.     As Pennsylvania state officials have recognized, Plaintiffs are not the only Pennsylvania gas royalty interest owners who have been harmed by Chesapeake's improper deduction of post-production costs in calculating royalty payments to Pennsylvania landowners.

33.     In a letter dated February 13, 2014 to Robert D. Lawler, Chesapeake's Chief Executive Officer, then-Governor Tom Corbett noted that, for some time, he had received complaints from his constituents and Chesapeake's leaseholder

"regarding practices of Chesapeake Energy which strike many as unfair and perhaps illegal." In particular, Governor Corbett noted that:

> Deductions of post-production costs, in a manner which seemingly few if any other operators in Pennsylvania utilize, has caused a significant erosion of the trust and goodwill the natural gas industry has established with Pennsylvania leaseholders and local communities.

Governor Corbett also noted that, by copy of the letter, he was urging Attorney General Kathleen Kane to examine the issue. *Id.*

34.    By letter dated February 14, 2014 to Doug McLinko, Chairman of the Bradford County Board of Commissioners, then-Governor Corbett noted that he had grown increasingly concerned about the treatment of Pennsylvania leaseholders with respect to the deduction of post-production costs, and stated that "our efforts to receive straightforward answers [regarding deduction of post-production costs] have led to even more confusion…."

35.    On December 9, 2015, the Commonwealth of Pennsylvania, Office of the Attorney General ("OAG"), commenced a civil action in the name of the Commonwealth of Pennsylvania in Court of Common Pleas of Bradford County, Pennsylvania, against Cheseapeake Energy, Chesapeake Appalachia, CEMI, Chesapeake Operating, L.L.C., and Williams Partners, LP, captioned *Commonwealth of Pennsylvania v. Chesapeake Energy Corp.*, Case No. 2015IR0069 (the "OAG Action").

36.     On information and belief derived from articles that appeared in the news media, the OAG conducted an intensive investigation before commencing the OAG action.

37.     In the OAG Action, the OAG alleged that the defendants had engaged in unfair methods of competition, and unfair or deceptive trade practices declared unlawful by the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P. S. § 201-1, *et seq.,* by taking or permitting wrongful deductions from amounts payable to Pennsylvania landowners pursuant to natural gas leases, and sought permanent injunctive relief, statutory restoration, civil penalties and other equitable relief.

38.     On February 8, 2016, the OAG filed a verified Amended Complaint in the OAG action, dropping Williams Partners, LP, as a party, and adding Anadarko Petroleum Corporation and Anadarko E&P Onshore, LLC, as additional party defendants, and adding a claim for common law restraint of trade.

39.     In the verified Amended Complaint in the OAG Action, the OAG alleges: (i) that Chesapeake Energy, Chesapeake Appalachia, Chesapeake Operating and CEMI (defined in the OAG Action as the "Chesapeake Defendants") entered into a joint venture with Anadarko and Anadarko E&P (defined in the OAG Action as the "Anadarko Defendants") in 2006, concerning an area of mutual interest in certain counties in northeast Pennsylvania within the Marcellus Shale gas play,

including Bradford, Centre, Clinton, Lycoming, Potter, Sullivan, Tioga and Wyoming (the "AMI Alleged in the OAG Action"); (ii) that the joint venture included collaboration concerning lease acquisition; (iii) that prior to the joint venture, the Chesapeake Defendants and the Anadarko Defendants competed for the acquisition of leases within the Marcellus Shale region; (iv) that following the consummation of the joint venture, the Chesapeake Defendants and the Anadarko Defendants assigned exclusive territories to each other for the acquisition of oil and gas leases, and agreed to allocate Bradford, Sullivan, Tioga and Wyoming Counties to Chesapeake, and Clinton, Lycoming and Potter Counties to Anadarko; and (v) that the Chesapeake Defendants and Anadarko Defendants acted in restraint of trade "by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the acreage signing bonuses and the royalty for oil and gas leases within the area of mutual interest covering the Marcellus Shale gas play in Pennsylvania." Amended Complaint in OAG Action, ¶ 214.

40.    On May 27, 2016, the OAG filed a Second Amended Complaint in the OAG Action. On the same date, the defendants named in the OAG Action filed a joint notice removing the action to federal court. The OAG has filed a motion to remand.

## JURISDICTION AND VENUE

41.     Plaintiffs bring the claims set forth in the First and Second Causes of Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the injuries sustained by Plaintiffs arising from violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. As a result, this Court has original subject matter jurisdiction over the claims set forth in the First and Second Causes of Action pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

42.     Plaintiffs bring the claim set forth in the Third and Fourth Causes of Action for violations of the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, et seq., to recover the damages they have sustained as a result of the participation by Chesapeake and Access Midstream in a scheme involving the conduct of the affairs of one or more de facto enterprises through what amounted to a pattern of racketeering activity.  As a result, this Court has original jurisdiction over the Third and Fourth Causes of Action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. §§ 1962 and 1964 (prohibited activities; civil remedies).

43.     This Court also has supplemental jurisdiction over the claims and parties named the Fifth through Ninth Causes of Action, pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), as the claims set forth therein are sufficiently

related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy.

44. This Court has personal jurisdiction over Defendants because each of them systematically and continuously transacts substantial business in the United States and in this District.

45. Venue is proper in this District pursuant to: 15 U.S.C. § 22 – which provides for venue of suits under the antitrust laws against a corporation in any district in which it may be found or transacts business; 18 U.S.C. § 1965(a) – which provides for venue in any district in which a RICO defendant transacts his affairs; and pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

46. Defendants' respective business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce.

## **PARTIES**

### **A.** **Plaintiffs**

47. Plaintiffs Robert C. Abrams, Jr., and Sonya M. Abrams are adult individuals residing in Monroeton, Pennsylvania, and the owners of real property situated in Monroe Township, Bradford County, Pennsylvania described as Property

Tax Parcel Identification Number ("PIN") 25-110.00-083-000-000, consisting of approximately 2.750 acres (the "Robert & Sonya Abrams Property").

48.     Plaintiff James M. Allen is an adult individual residing in Wysox, Pennsylvania, and the owner of an undivided fifty percent (50%) interest in real property situated in Wysox Township, Bradford County, Pennsylvania, described as PIN 62-62-29, consisting of approximately 62.63 acres, and PIN 62-62-28, consisting of approximately 50.68 acres, together comprising approximately 112.91 acres (the "Allen Property").

49.     Plaintiffs Theodore R. Babcock and Connie R. Babcock are adult individuals residing in Laceyville, and the owners of multiple parcels of real property situated in Tuscarora Township, Bradford County, and Auburn Township, Susquehanna County, Pennsylvania, including parcels described as PIN 54-116-82 and 54-104-122; 123, consisting of approximately 44.39 acres (the "Babcock Property").

50.     Plaintiff Dale G. Bennett and Donna M. Bennett t/a D+D Bennett Partners Limited Partnership, are adult individuals residing in Laceyville, Pennsylvania, and the general partners of plaintiff D+D Bennett Partners Limited Partnership ("D+D Bennett Partners LP"), a Pennsylvania limited partnership. Plaintiff D+D Bennett Partners LP is the owner of real property situated in Tuscarora Township, Bradford County, Pennsylvania, described as PIN 54-104.00-103-000-

000, consisting of approximately 164.053 acres (the "D+D Bennett Partners LP Property").

51.     Plaintiffs Thomas E. Blanchard and Margaret K. Blanchard are adult individuals residing in Towanda, Pennsylvania, and the owners of real property situated in Standing Stone Township, Bradford County, Pennsylvania described as PIN 43-088.00-052.7, consisting of approximately 44.39 acres (the "Blanchard Property").

52.     Plaintiffs William T. Bohensky, Jr., and Laura G. Bohensky are adult individuals residing in Dushore, Pennsylvania, and the owners of real property situated in Cherry Township and Dushore Borough, Sullivan County, Pennsylvania described as PIN 01-070-0080, consisting of approximately 59.00 acres, PIN 01-097-0016, consisting of approximately 103.23 acres, and PIN 04-004-034, consisting of 0.96 acres, together comprising approximately 154.19 acres (the "Bohensky Property").

53.     Plaintiff Charles W. Brown, Jr., is an adult individual residing in Monroeton, Pennsylvania, and the owner of real property situated in Monroe Township, Bradford County, Pennsylvania, described as PIN 21-099.00-040-000-000, consisting of approximately 162.87 acres (the "Charles Brown Property").

54.     Plaintiff Jan Robert Brown is an adult individual residing in Wyalusing, Pennsylvania, and the owner of real property situated in Wilmot Township, Bradford

County, Pennsylvania, described as PIN 58-127-14, consisting of approximately 284.023 acres (the "Jan Brown Property").

55.    Plaintiffs Marilyn Bryan a/k/a Marilyn H. Snyder Bryan and Thomas Bryan are adult individuals residing in Sugar Run Pennsylvania, and the owners of an undivided one-third (1/3) interest in real property situated in Wilmot Township, Bradford County, Pennsylvania described as PIN 58-137-43, consisting of approximately 154 acres (the "Snyder/Kisner/Bryan Property").

56.    Plaintiff John Burke is an adult individual residing in Tunkhannock, Pennsylvania, and the owner of a fifty percent (50%) interest in the oil, gas and mineral rights in, to and under that certain parcel of land situated in Wilmot Township, Bradford County, Pennsylvania, described as PIN 52-127.00-056-000-000, consisting of approximately 19.875 acres (the "Burke Property").

57.    Plaintiff Ty C. Cobb is an adult individual residing in Wyalusing, Pennsylvania, and the owner of multiple parcels of real property situated in Tuscarora and Wyalusing Townships, Bradford County, Pennsylvania, including: parcels situated in Tuscarora Township described as PIN 54-90-32, consisting of approximately 33.71 acres, PIN 54-103-4, consisting of approximately 155.49 acres, 54-103-6, consisting of approximately 50.25 acres, PIN 54-104-3, consisting of approximately 5.37 acres, and PIN 54-104-14, consisting of approximately 16.54 acres, together comprising approximately 261.36 acres ("Cobb Property 1"); and a

parcel partially situated in both Tuscarora and Wyalusing Townships, described as PIN 61-90-36, consisting of approximately 30.66 acres ("Cobb Property 2").

58.   Plaintiffs Jack C. Corbett and Janice M. Corbett are adult individuals residing in Towanda, Pennsylvania, and the owners of real property situated in Standing Stone Township, Bradford County, Pennsylvania described as PIN 43-089.00-110, consisting of approximately 77 acres (the "Jack and Janice Corbett Property").

59.   Plaintiffs Kim R. Corbett and Debra C. Jones are adult individuals residing in Bradford County, Pennsylvania, and the owners of fifty percent (50%) of the rights in and to the oil, gas and other minerals in and under the Jack and Janice Corbett Property.

60.   Plaintiffs Wayne M. Cummiskey and Andrae L. Cummiskey are adult individuals residing in New Albany, Pennsylvania, and the owners of multiple parcels of real property situated in Albany Township, Bradford County, Pennsylvania, described as: PIN 02-135-109, consisting of approximately 40.279 acres; PIN 02-135-111, consisting of approximately 50.00 acres; PIN 02-135-142, consisting of approximately 28.29 acres; PIN 02-135-145, consisting of approximately 53.18 acres; PIN 02-135-149, consisting of approximately 3.72 acres; and PIN 02-135-146, consisting of approximately 50.00 acres; together comprising approximately 225.469 acres (the "Cummiskey Property").

24

61.    Plaintiff Roberta F. Davis is an adult individual residing in Rome, Pennsylvania, and the owner of real property situated in Tuscarora Township, Bradford County, Pennsylvania, described as PIN 54-116-34, consisting of approximately 101 acres (the "Roberta Davis Property").

62.    Plaintiff Roberta Jean Pennay Dyer is an adult individual residing in Towanda, Pennsylvania, and the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as PIN 04-101-107, consisting of approximately 51 acres (the "Roberta Dyer Property").

63.    Plaintiff Lyle R. Fenton is an adult individual residing in Sugar Run Pennsylvania, and the owner of multiple parcels of real property situated in Wilmot Township, Bradford County, Pennsylvania, including parcels described as PIN 58-137-65, consisting of approximately 139 acres, and PIN 58-137-69, consisting of approximately 91 acres, together comprising approximately 139 acres ("Fenton Property 1"), and a parcel described as PIN 58-137-76, consisting of approximately 23.17 acres ("Fenton Property 2").

64.    Plaintiffs William David Gilbert and Jennifer Gilbert are adult individuals residing in Canton, Pennsylvania, and the owners of real property situated in Leroy Township, Bradford County, Pennsylvania, described as PIN 22-107-131-1, consisting of approximately 128 acres (the "Gilbert Property").

65.    Plaintiff Gary L. Hall is an adult individual residing in Towanda, Pennsylvania, and the owner of an undivided 2.984262% share of all right, title and interest in and to all of the oil, gas and hydrocarbons in and under and that may be produced from lands situated in Wyalusing Township, Pennsylvania, described as PIN 61-101.00-171-000-000, containing approximately 106 acres in the aggregate (said share of such right, title and interest, the "Gary Hall Property"), pursuant to an Oil and Gas Deed dated November 22, 2011, by William W. Them, Executor of the Estate of Shirley L. Jackson, subject to any rights existing to any lessee or assigns under any valid and subsisting oil and gas lease then of record.

66.    Plaintiffs Joshua L. Hees and Tamara O. Hees are adult individuals residing in Shunk, Pennsylvania, and the owners of real property situated in Fox Township, Sullivan County, Pennsylvania, described as PIN 09-092-0016-001, consisting of approximately 10.005 acres (the "Hees Property").

67.    Plaintiff Raymond Henninger, Jr., is an adult individual residing in Rome, Pennsylvania, and the owner of real property situated in Wilmot Township, Bradford County, Pennsylvania, described as PIN 58-136.00-044, consisting of approximately 88 acres (the "Henninger Property").

68.    Plaintiffs Richard R. Higley and Charlotte L. Higley, are adult individuals residing in Forksville, Pennsylvania, and the owners of multiple parcels of real property situated in Elkland Township, Sullivan County, Pennsylvania,

including parcels described as PIN 06-089-0094, consisting of approximately 22.45 acres, PIN 06-075-0010, consisting of approximately 81.56 acres, and PIN 06-103-0079, consisting of approximately 19.132 acres, together comprising approximately 123.142 acres (the "Richard & Charlotte Higley Property").

69.     Plaintiff Higley Tall Spruce LLC is a Pennsylvania limited liability company with offices in Forksville, Pennsylvania, and the owner of all interest in and to all of the oil, gas and other minerals in and under and that may be produced from certain parcels of land situated in Elkland Township, Sullivan County, Pennsylvania, defined above as the Richard & Charlotte Higley Property,  pursuant to a Mineral Deed dated April 30, 2012, recorded on May 24, 2012, at Sullivan County Instrument Number 201201557, subject to any rights then existing to any lessee or assigns under any valid and subsisting oil and gas lease of record.

70.     Plaintiff JEMSCO Star, LLC, is a Pennsylvania limited liability company with officers in Sugar Run, Pennsylvania, and the owner of all right, title and interest in, to and under certain Oil and Gas Leases described below, and all payments due thereunder, and all economic entitlements, benefit and advantage to be derived therefrom, with respect to certain parcels of real property situated in Monroe and Wilmot Townships, Bradford County, Pennsylvania, described as PIN 25-110.00-098-000-000, consisting of approximately 9.03 acres ("Jones Property 1"),  and PIN 58-137.00-118-001-000, consisting of approximately 30.51 acres, and

PIN 58-137.00-124-000-000, consisting of approximately 39.43 acres (together, "Jones Property 2").

71.    Plaintiff Edward S. Kalinowski is an adult individual residing in Canton, Pennsylvania, and the owner of multiple parcels of real property situated in Leroy and West Burlington Townships, Bradford County, Pennsylvania, including parcels described as PIN 22-107-87, PIN 12-83-3-1, and PIN 12-70-3, together comprising approximately 242.82 acres (the "Kalinowski Property").

72.    Plaintiffs Lynn H. Kinch and Gail Kinch are adult individuals residing in Granville Summit, Pennsylvania, and the owners of real property in Bradford County, Pennsylvania, including a parcel situated in Granville Township, described as PIN 19-106.00-191-000-000, and a parcel situated in Leroy Township, described as PIN 22-108.00-016-000-000, together consisting of approximately 61.89 acres (the "Kinch Property").

73.    Plaintiffs Marjorie E. Snyder Kisner and Jesse Kisner are adult individuals residing in Sugar Run, Pennsylvania, and the owners of an undivided one-third (1/3) interest in a parcel of real property situated in Wilmot Township, Bradford County, Pennsylvania, described as PIN 58-237-43, which consists of approximately 154 acres (defined above as the "Snyer/Kisner/Bryan Property").

74.    Plaintiffs Anthony J. Latini and Melissa L. Latini are adult individuals residing in Wyalusing, Pennsylvania, and are the owners of multiple parcels of real

property situated in Wyalusing and Tuscarora Townships, Bradford County, Pennsylvania, described as PIN 54-103.00-001-000-000, PIN 61-103.00-079-000-000, PIN 63-103.00-077-000-000, and PIN 61-103.00-079-003-000, together comprising approximately 535.864 acres (the "Latini Property").

75.    Plaintiff Latini Management, LLC, t/a Latini Resources, LP, is Pennsylvania limited liability company with offices in Wyalusing, Pennsylvania, the general partner of plaintiff Latini Resources, LP, a Pennsylvania limited partnership. Plaintiff Latini Resources, LP is the owner of the oil gas and mineral rights in, to and under the Latini Property, pursuant to a Mineral Deed dated May 13, 2011, and recorded on May 23, 2011, as Bradford County Instrument Number 201114556, and the owner of all right, title and interest formerly held by Anthony J. Latini and Melissa L. Latini, as Lessor,  in and to an oil and gas lease pertaining to the Latini Property, described in further detail below, pursuant to an Assignment of Lease dated May 13, 2011, and recorded on May 23, 2011, as Bradford County Instrument Number     201114558.

76.    Plaintiffs Michael J. McGroarty a/k/a Michael McGroarty and Margaret M. McGroarty are adult individuals residing in New Albany, Pennsylvania, and the owners of multiple parcels of real property situated in Overton and Albany Townships, Bradford County, Pennsylvania, described as PIN 28-133-

94, 28-134-5.2, and 2-122-144, together consisting of approximately 120.6 acres (the "McGroarty Property").

77.    Plaintiffs Edward F. McKernan and Deborah H. McKernan, Joseph E. McKernan, and Joseph T. McKernan, adult individuals residing in Towanda, Pennsylvania, are the owners of real property situated in North Towanda and Burlington Townships, Bradford County, Pennsylvania described as PIN 51-072.00-047-000-000, consisting of approximately 156.76 acres, (the "McKernan Property").

78.    Plaintiffs Earl C. Miller and Ann L. Miller are adult individuals residing in Auburtis, Pennsylvania, and the owners of multiple parcels of real property situated in Albany Township and New Albany Borough, Bradford County, Pennsylvania, including parcels described as PIN 02-134.00-184-000-000, consisting of approximately 23.55 acres, and PIN 02-134.00-191-000-000 and PIN 02-134.01-103-000-000, consisting of approximately 36.97 acres, together comprising a total of approximately 60.52 acres ("Miller Property 1"), and a parcel described as PIN 02-134.00-124-000-000, consisting of approximately 10 acres ("Miller Property 2").

79.    Plaintiffs Randy L. Morse and Virginia K. Morse are adult individuals residing in Canton, Pennsylvania, and the owners of multiple parcels of real property situated in Leroy Township, Sullivan County, Pennsylvania, including parcels described as PIN 22-107.00-149, consisting of approximately 165.93 acres, 22-

107.00-124, consisting of approximately 15.13 acres, and PIN 22-107.00-125, consisting of approximately 60.00 acres, together comprising approximately 241.06 acres (the "Morse Property").

80.    Plaintiffs Gary R. Norconk, Sharon M. Norconk, and Linda L. Kisner, Individually and t/a Norconk Family Limited Partnership ("Norconk FLP"), are adult individuals residing in Hunlock Creek and New Albany, Pennsylvania, respectively, and are the general partners of Norconk FLP, a Pennsylvania limited partnership. Plaintiffs Gary R. Norconk and Linda L. Kisner are the owners of parcels of real property situated in Wilmot Township, Bradford County, Pennsylvania, described as PIN 58-140.00-013-000-000, consisting of approximately 89.76 acres, PIN 58-136.00-118-001-000, consisting of approximately 0.54 acres, PIN 58-136.00-120-000-000, consisting of approximately 3.36 acres, and PIN 58-136.00-121-000-000, consisting of approximately 96 acres, together comprising approximately 189.66 acres (the "Norconk Property"), by Deed dated November 9, 2009, and recorded on December 7, 2009, as Instrument Number 200927246, from Raymond C. Norconk and Shirley M. Norconk. Norconk FLP is the owner by assignments of the Oil and Gas Lease described below pertaining to the Norconk Property.

81.    Plaintiffs Kevin R. Potter and Donna E. Potter are adult individuals residing in Wyalusing, Pennsylvania, and the general partner of plaintiff K&D

Acres, F.L.P., a Pennsylvania limited partnership. Plaintiffs Kevin and Donna Potter are the owners of multiple parcels of real property located in Terry Township, Bradford County, Pennsylvania, described as PIN 46-114.00-004-000-000, consisting of approximately 83.15 acres, 46-114.00-024-000-000, consisting of approximately 172.253 acres, and PIN 46-114.00-24.1, consisting of approximately 11.26 acres, together comprising approximately 266.662 acres (the "Pottter Property"). Plaintiff K&D Acres is the owner by assignment from plaintiffs Kevin and Donna Potter of an oil and gas lease relating to the Potter Property, identified below, and all leaseholds and other rights, titles and interests that Kevin and Donna Potter had by virtue of the lease, pursuant to an Assignment of Lease dated November 16, 2009, and recorded on November 30, 2009 at Bradford County Instrument Numbers 200926196 and 200926197.

82.     Plaintiffs Raymond J. Raffin and Mary Ann Raffin are adult individuals residing in Wyalusing, Pennsylvania, and the owners of multiple parcels of land situated in Bradford County, Pennsylvania, including a parcel situated in Sheshequin Township, described as PIN 38-73-300, consisting of approximately 61.0 acres, and a parcel situated in Wyalusing Township, described as PIN 61-102-09, consisting of approximately 9.1 acres, together comprising approximately 70.1 acres (the "Raffin Properties"). Plaintiffs Raymond J. Raffin and Mary Ann Raffin bring this action individually, and also as Trustees of The Raffin Family Trust dated April 10, 2003

(the "Raffin Family Trust"), and as Trustees of the The Raymond J. and Mary Ann Raffin Gas Protector Trust (the "Raffin Gas Protector Trust"). The Raffin Family Trust is the owner of forty percent (40%) interests, and the Raffin Gas Protector Trust is the owner of sixty percent (60%) interests, in: (a) all of the oil and gas in, under and that may be produced from, the Raffin Properties, pursuant to a Hydrocarbon Deed dated May 7, 2012, and recorded on August 1, 2012, in Bradford County, as Instrument Number 201220399, subject to the existing oil and gas lease described in the Hydrocarbon Deed and below, between Raymond J. and Mary Ann Raffin, as Trustees of the Raffin Family Trust, and Anadarko E&P Company LP, dated July 28, 2006 (the "Raffin Lease"); and (b) all of the right, title and interest of Raymond J. and Mary Ann Raffin, as Trustees of the Raffin Family Trust, in the Raffin Lease, pursuant to the terms of an Assignment of Oil and Gas Lease dated May 7, 2012, and recorded on August 1, 2012, and recorded in Bradford County, as Instrument Number 201220398.

83.     Plaintiffs April A. Rine and Jeffrey J. Rine are adult individuals residing in Bellefonte, Pennsylvania, and the owners of real property situated in Cherry Township, Sullivan County, Pennsylvania described as PIN 01-083-006-0001, consisting of approximately 72.58 acres (the "Rine Property").

84.     Plaintiff Joyce Ann Rohe is an adult individual residing in Dushore, Pennsylvania, and the owner of an undivided 1/59.35 interest in the surface of land

situated in Forks Township, Sullivan County, Pennsylvania, described as PIN 07-086-0002, consisting of approximately 60 acres in the aggregate (the "Rohe Property"), together with a 16.50% share of the oil and gas mineral rights to the Rohe Property, and of all right, title and interest of the Lessor in and to the Oil and Gas Lease dated March 19, 2006, described below, between Melvin E. Rohe [Sr.] and Elizabeth S. Rohe, as Lessor, and Anadarko E&P Company, LP, as Lessee, regarding the Rohe Property (the "Rohe Oil and Gas Lease").

85.    Plaintiff Melvin E. Rohe, Jr., is an adult individual residing in Dushore, Pennsylvania, and the owner of an undivided 23.19/59.35 interest in the surface of the Rohe Property, as defined in the preceding paragraph, together with a 34.35% share of the oil and gas mineral rights to the Rohe Property, and of all right, title and interest of the Lessor in and to the Rohe Oil and Gas Lease.

86.    Plaintiff Michael B. Saxe, Individually and t/a Marcellus Five Family Limited Partnership, is an adult individual residing in Wilmot Township, Pennsylvania, and the general partner of plaintiff Marcellus Five Family Limited Partnership ("Marcellus Five FLP"), a Pennsylvania limited partnership. Marcellus Five FLP is the owner of multiple parcels of real property situated in Bradford and Sullivan Counties, Pennsylvania, including parcels situated in Wilmot Township, Bradford County, described as PIN 58-140.00-015-000-000, consisting of approximately 101.84 acres,    PIN 58-140.00-017-000-000, consisting of

approximately 125.00 acres, and PIN 58-140.00-010-000-000, consisting of approximately 0.860 acres, together comprising approximately 227.7 acres (together, "Marcellus Five FLP Property 1"), and parcels situated in Cherry and Colley Townships, Sullivan County, described as PIN 01-096-0003, consisting of approximately 63.98 acres, PIN 01-096-0005-001, consisting of approximately 6.91 acres, PIN 01-096-0005-002, consisting of approximately 17.90 acres, PIN 01-096-0006, consisting of approximately 107.92 acres, PIN 01-096-0007, consisting of approximately 0.50 acres, PIN 01-096-0009-002, consisting of approximately 41.49 acres, PIN 02-082-0008, consisting of approximately 4.59 acres, PIN 02-095-0017, consisting of approximately 64.00 acres, PIN 02-096-0011-001, consisting of approximately 35.62 acres, PIN 02-096-0011-002, consisting of approximately 19.43 acres, and PIN 02-096-0013-001, consisting of approximately 65.51 acres, together comprising approximately 427.85 acres (together, "Marcellus Five FLP Property 2").

87.    Plaintiff Thomas Schmeckenbecher, Individually and t/a Thomas Schmeckenbecher Family, LP, is an adult individual residing in Wysox, Pennsylvania, and the general partner of plaintiff Thomas Schmeckenbecher Family, LP, a Pennsylvania limited partnership. Plaintiff Thomas Schmeckenbecker, individually, is the owner of an undivided one-half (1/2) interest in and to multiple parcels of real property situated in Wysox Township, Bradford County,

Pennsylvania, described as PIN 62-75-1, 62-75-1.6, and 62-74-107, consisting of a total of approximately 348.11 acres (collectively, the "Schmeckenbecher Property"). Plaintiff Thomas Schmeckenbecker Family, LP is the owner by assignment of an undivided seventy-five percent (75%) interest in and to all right, title and interest of Daniel G. Schmeckenbecher and Thomas Schmeckenbecher in and to an Oil and Gas Lease dated March 24, 2006, with Anadarko E&P Company, LP, for the Schmeckenbecher Property, pursuant to an Assignment of Oil and Gas Lease dated May 30, 2012, and recorded July 31, 2012, at Bradford County Instrument No. 201219934, from Daniel G. Schmeckenbecher and Thomas Schmeckenbecher, as Assignors, to Daniel Schmeckenbecher Family, LP, and Thomas Schmeckenbecher Family, LP, as Assignees.

88.     Plaintiffs Scott R. Shores and Laura K. Shores are adult individuals residing in New Albany, Pennsylvania, and the owners of multiple parcels of real property situated in Bradford County, Pennsylvania, including a parcel situated in Wysox Township, described as PIN 62-074.00-048-000, consisting of approximately 40 acres ("Shores Property 1"), and parcels situated in Sheshequin Township, described as PIN 38-61-39, consisting of approximately 63 acres, and PIN 38-61-47.1, consisting of approximately 152 acres, together comprising approximately 152 acres ("Shores Property 2").

89.     Plaintiffs James Swingle, Jr. and Susan Swingle are adult individuals residing in Dushore, Pennsylvania, and the owners of real property situated in Forks Township, Sullivan County, Pennsylvania, described as PIN 07-086-004, consisting of approximately 0.840 acres (the "Swingle Property"). Plaintiff Susan Swingle also is the owners of an undivided 1.16/59.35 fractional interest in the surface of the Rohe Property, as defined above, together with a 16.77% share of the oil and gas mineral rights to the Rohe Property, and of all right, title and interest of the Lessor in and to the Rohe Oil and Gas Lease.

90.     Plaintiff Betty J. Them is an adult individual residing in Wysox, Pennsylvania, and the owner of real property situated in Wyalusing Township, Bradford County, Pennsylvania, described as PIN 61-102-9 and 61-102-10, together consisting of approximately 125.52 acres (" Betty Them Property 1"), as well as the owner of an undivided 14.92131% share of all right, title and interest in and to all of the oil, gas and hydrocarbons in and under and that may be produced from lands situated in Wyalusing Township, Pennsylvania, described as PIN 61-101.00-171-000-000, containing 106 acres in the aggregate (said share of such right, title and interest "Betty Them Property 2"), pursuant to an Oil and Gas Deed dated November 22, 2011, and recorded November 28, 2011, at Instrument No. 201128913, by William W. Them, Executor of the Estate of Shirley L. Jackson, subject to any rights

existing to any lessee or assigns under any valid and subsisting oil and gas lease then of record.

91.     Plaintiff William W. Them, Trustee of the William W. Them Living Trust, is an adult individual residing in Wysox, Pennsylvania, and the owner of multiple parcels of real property situated in Wysox Standing Stone and Burlington Townships, Bradford County, Pennsylvania, described as PIN 62-075.00-173-000-000, PIN 62-075.00-177-000-000, PIN 62-075,00-178-000-000, PIN12-85-2, PIN 43-88-66, and PIN 62-87.11-10.1, together consisting of approximately 255.431 acres (together, the "Them Property").

92.     Plaintiff Towanda Country Club is a Pennsylvania non-profit (non stock) corporation with offices in Wysox, Pennsylvania, and is the owner of multiple parcels of real property situated in Wysox Township, Bradford County, Pennsylvania, described as PIN 62-087.00-158-000-000, consisting of approximately 144.91 acres, PIN 62-087.00-161-000-000, consisting of approximately 140 acres, PIN 62-087.00-011-000-000, consisting of approximately 0.5 acres, and PIN 62-087.2-042-000-000, consisting of approximately 1.6 acres, together comprising approximately 287.01 acres (the "Towanda Country Club Property").

93.     Plaintiff Robert W. Watkins is an adult individual residing in Towanda, Pennsylvania, and the owner of real property situated in Asylum Township,

Bradford County, Pennsylvania, described as PIN 04-101.00-017-000-000, consisting of approximately 30 acres (the "Watkins Property").

94.     Plaintiff Wickward Management, LLC, t/a Wickward Resources, LP, is Pennsylvania limited liability company with offices in Wyalusing, Pennsylvania, and the general partner of plaintiff Wickward Resources, LP, a Pennsylvania limited partnership. Plaintiff Wickward Resources, LP is the owner of all of the oil, gas and other minerals in and under and that may be produced from lands situated in Wyalusing Township, Bradford County, Pennsylvania, described as PIN 61-090-16, consisting of approximately 117 acres, and PIN 61-101-194, consisting of approximately 83.28 acres, together comprising approximately 200.281 acres (the "Wickward Resources, LP Property"), pursuant to a Mineral Deed dated July 19, 2011, and recorded August 22, 2011, as Bradford County Instrument Number 201120850, subject to any rights then existing to any lessee or assigns under any valid and subsisting oil and gas lease then of record. Wickward Resources, LP, is also the owner of all right, title and interest that Kenneth H. Howard and Julie C. Howard, as Lessors, had in an to an Oil and Gas Lease dated June 30, 2006 with Anadarko E&P Company LP, as Lesee, pertaining to the subsurface oil and gas associated with the real estate described above as the Wickward Resources LP Property.

95.    Plaintiff Gary Wickwire is an adult individual residing in Wysox, Pennsylvania, and the owner of multiple parcels of real property situated in Wysox Township, Bradford County, Pennsylvania, including parcels described as PIN 62-75-143, consisting of approximately 14.45 acres, PIN 62-75-144, consisting of approximately 28.37 acres, PIN 62-75-145, consisting of approximately 3.07 acres, PIN 62-75-146, consisting of approximately 9.57 acres, PIN 62-75-100, consisting of approximately 41.4 acres, and PIN 62-75-100, consisting of approximately 62.06 acres, together comprising approximately 158.92 acres (together, "Gary Wickwire Property 1"), and a parcel described as PIN 62-75-109.3, consisting of approximately 14.2 acres ("Gary Wickwire Property 2").

96.    Plaintiff Scott A. Wickwire, t/a Wickwire Family Limited Partnership, is an adult individual residing in Wysox, Pennsylvania, and the general partner of plaintiff Wickwire Family Limited Partnership ("Wickwire FLP"), a Pennsylvania limited partnership. Plaintiff Wickwire FLP is the owner of real property situated in Wysox Township, Bradford County, Pennsylvania, described as PIN 62-075-00-095-000-000, consisting of approximately 105.32 acres (the "Wickwire FLP Property").

97.    Plaintiff Chuck Will a/k/a Charles Will is an adult individual residing in Underwood, Minnesota, and the owner of real property situated in Asylum

40

Township, Bradford County, Pennsylvania described as PIN 04-088.00-045-000-000, consisting of approximately 20 acres (the "Will Property").

## B. **Defendants**

98.    Defendant Chesapeake Energy Corporation ("Chesapeake Energy") is a corporation organized under Oklahoma law, with its principal place of business in Oklahoma City, Oklahoma. Chesapeake Energy is a publicly traded oil and gas company which, through its subsidiaries, including but not limited to Chesapeake Appalachia, is one of the largest producers of natural gas in the United States.

99.    Chesapeake Energy provides the following summary of its business on its corporate website:

> Founded in 1989, Chesapeake's operations are focused on discovering and developing onshore, unconventional oil and natural gas fields in the U.S. We currently hold leading positions in the Eagle Ford, Utica, Granite Wash, Cleveland, Tonkawa, Mississippi Lime and Niobrara unconventional liquids plays and the Marcellus, Haynesville/Bossier and Barnett unconventional natural gas shale plays. The company also owns substantial marketing and compression businesses.
>
> As one of the first to recognize the vast potential of shale resources unlocked by advances in horizontal drilling techniques, Chesapeake has grown to become the second-largest producer of natural gas, 11th largest producer of oil and natural gas liquids, and the most active driller of onshore wells in the country.[3]

---

[3]    http://www.chk.com/About/Pages/Default.aspx

100.   Defendant Chesapeake Appalachia is a limited liability company organized under Oklahoma law, with its principal place of business in Oklahoma City, Oklahoma. Defendant Chesapeake Energy is the sole member of Chesapeake Appalachia.

101.   Defendant Chesapeake Energy Marketing, Inc. ("CEMI"), is a corporation organized under Oklahoma law, with its principal place of business in Oklahoma City, Oklahoma. CEMI is a wholly-owned subsidiary of defendant Chesapeake Energy.

102.   CEMI provides natural gas, oil and NGL marketing services, commodity price structuring, contract administration and nomination services, for Chesapeake, other interest owners in Chesapeake-operated wells and other producers. Among its other activities, CEMI aggregates volumes of gas produced from multiple wells, including wells located on separately owned properties pursuant to multiple different mineral leases, which are then sold to various intermediary markets, end markets and pipelines.

103.   Defendant Chesapeake Operating, L.L.C., as successor by merger to and f/k/a Chesapeake Operating, Inc. ("Chesapeake Operating"), is a corporation organized under Oklahoma law, with its principal place of business in Oklahoma

City, Oklahoma. Chesapeake Operating is a wholly-owned subsidiary of defendant Chesapeake Energy.

104.    Chesapeake Operating, on information and belief, is responsible for the drilling and production of gas from leases in which Chesapeake entities hold the operating interest.

105.    At all times relevant and material hereto, Chesapeake Energy exercised ultimate control over Chesapeake Appalachia, CEMI and Chesapeake Operating.

106.    Defendant Anadarko Petroleum Corporation ("Anadarko Petroleum") is a Delaware corporation with its principal place of business in Texas. On information and belief, Anadarko Petroleum, itself and through and with its subsidiaries and joint venture partners, engages in trade or commerce in Pennsylvania through the exploration, production, drilling, extraction, gathering, compression, transportation, marketing and sale of natural gas, and through the solicitation and procurement of gas mineral rights and interests in oil and gas leases for value.

107.    Defendant Anadarko E&P Onshore LLC, successor by conversion to and f/k/a Anadarko E&P Company, L.P. ("Anadarko E&P"), is a limited liability company organized under Delaware law, with its registered address in Delaware and its principal place of business in Houston, Texas. It is a wholly- owned subsidiary

of Anadarko USH1 Corporation, which was incorporated in Delaware and has its principal place of business in Houston, Texas.

108.   At all times relevant and material hereto, Anadarko Petroleum Chesapeake Energy exercised ultimate control over Anadarko E&P.

109.   Defendant Williams Partners, LP, f/k/a Access Midstream Partners, L.P. ("Access Midstream"), is a publicly-traded limited partnership organized under Delaware law, with its principal place of business in Oklahoma City, Oklahoma. Chesapeake Energy formed Access Midstream (formerly known as Chesapeake Midstream Partners, L.P.) in 2010 to own, operate, develop and acquire natural gas, natural gas liquids and oil gathering systems and other midstream energy assets. The business of Access Midstream is principally focused on natural gas and NGL gathering, the first segment of midstream energy infrastructure that connects natural gas and NGLs produced at the wellhead to third-party takeaway pipelines.

110.   Defendant Access MLP Operating, L.P. ("Access Operating"), is a Delaware limited partnership with its principal place of business in Oklahoma City, Oklahoma. On information and belief, Access Operating is a direct or indirect subsidiary of Access Midstream, and serves as the operating entity for the natural gas gathering and transportation business of Access Midstream, and all of the general and limited partners of Access Operating reside or have their principal places

of business in, and are citizens of, states other than Pennsylvania, New Jersey and New York.

111.   Defendant Appalachia Midstream Services, L.L.C. ("Appalachia Midstream"), is an Oklahoma limited liability company with its principal place of business in Oklahoma. On information and belief, Appalachia Midstream was a direct or indirect subsidiary of Chesapeake Energy.

112.   Defendant Mitsui E&P USA LLC ("Mitsui E&P"), is a limited liability company organized under Delaware law, with its principal place of business in Houston, Texas. On information and belief, it is a wholly-owned direct or indirect subsidiary of Mitsui & Co., Ltd., a public company organized and existing under the laws of Japan, with its principal place of business in Japan.

## FACTUAL BACKGROUND

### A. The Use of Horizontal Drilling and Hydraulic Fracking to Produce Natural Gas from the Marcellus Shale; the Resulting Need to Establish Drilling and Production Units Combining Multiple Leaseholds

113.   Beginning in the late 1990s and early 2000s, natural gas producers discovered that, through the use of a combination of horizontal drilling and hydraulic fracturing (or "fracking") technologies, natural gas could be cost-effectively released and extracted from shale and otherwise impermeable rock formations.

114.   Cost-effective exploration, drilling and production of natural gas from shale formations such as the Marcellus Shale entails the use of long lateral wellbores

45

which can exceed 5,000 feet, and inevitably cross beneath the boundaries of multiple surface properties, which requires gas operators to lease and then combine or pooling multiple separate leasehold properties to form single, larger drilling and production units, which are typically 640 to 1,200 acres in size. The lessors of the leaseholds combined into a unit (or their successors in interest) receive a royalty on a specified share of the gas produced from wells drilled anywhere on the unit, in accordance with the provisions of their respective oil and gas leases.

### B.     The Natural Gas in Which Plaintiffs Own Royalty Interests Is Not In Marketable Form at the Wellhead; To Be Marketable, The Gas Must First Be Gathered and Transported to Commercial Market Hubs or the Locations of Other Markets.

115.    There is no commercial market for shale gas at the wellhead.  As a result, after natural gas is extracted at the wellhead, and before it can be sold, the gas must be moved through a system of "gathering" pipelines, which consist of relatively low pressure and small diameter (in comparison to interstate transmission pipelines) intrastate pipelines that transport raw natural gas from the wellhead either to a processing plant, for subsequent delivery to larger diameter intrastate or interstate pipelines, or directly to pipelines, to reach the market hubs at which the gas can be sold to third-parties. As illustrated in Access Midstream's 2013 Annual Report filed with the Securities and Exchange Commission ("SEC") on Form 10-K on February 21, 2013, Access Midstream's business focuses on the gathering and processing of natural gas between the wellhead and the major transportation pipelines:



116.   The transportation of gas through interstate transmission pipelines is governed by regulations and tariffs established by the  Federal Energy Regulatory Commission ("FERC"), which limit the fees that can be charged for transportation of gas through such pipelines, Although Federal rules limit the fees that can be charged for the transportation of natural gas through interstate pipelines, to prevent price gouging, Access Midstream takes the position that such Federal regulations do not apply to intrastate gathering and pipeline transportation systems.

### C.    Chesapeake Pursue  a Vertically Integrated, Highly Leveraged Business Model.

117.   Once the potential returns from horizontal drilling and fracking became clear, many oil and gas production companies, including Anadarko and Chesapeake Energy, embarked on aggressive programs to acquire oil and gas leases to properties located above multiple shale formations throughout the United States, including the Marcellus Shale, which is located in Pennsylvania. As Chesapeake Energy explained in its 2000 Annual Report on Form 10-K, filed on March 1, 2001:

> we embarked on an aggressive lease acquisition program, which we have referred to as the "gas shale land grab" of 2006 through 2008 and the "unconventional oil

> land grab" of 2009 and 2010. We believed that the winner
> of these land grabs would enjoy competitive advantages
> for decades to come as other companies would be locked
> out of the best new unconventional resource plays in the
> U.S.

118.    At the same time, both Anadarko and Chesapeake pursued vertically integrated business model that included not only the production of natural gas, but also related interlocking business opportunities in midstream gathering and other sectors of the gas exploration and production business in the Marcellus Shale region.

119.    To fund its gas shale land grab, and the related aggressive growth and development of its interlocking vertical businesses, Chesapeake Energy borrowed increasingly greater amounts of money, resulting in it having a highly leverage balance sheet, including current liabilities of  $7 billion, and long term liabilities of almost $17 billion, by the end of 2011.

**D.    Chesapeake Commences Its Land Grab by Acquiring Competitors.**

120.    On November 14, 2005, Chesapeake Appalachia acquired Columbia Natural Resources, LLC ("CNR"), and certain of its affiliates, for $2.95 billion, consisting of $2.2 billion in cash and $0.75 billion in liabilities assumed at closing. Through this transaction, Chesapeake Appalachia acquired oil and gas leases and other assets relating to properties principally located in the Appalachian Basin in West Virginia, Kentucky, Ohio, Pennsylvania (including, but not limited to, Bradford County) and New York.

**E.      Chesapeake and Anadarko Begin to Compete to Acquire Oil and Gas Leases in and Around Bradford County.**

121.    The Marcellus Shale formation, located in and beyond Pennsylvania, soon was determined to contain one of the largest natural gas reserves in the world. Both Chesapeake and Anadarko targeted Bradford County, Pennsylvania, and adjacent portions of Sullivan, Susquehanna and Wyoming Counties, for aggressive lease acquisition programs, and for the development of the natural gas gathering systems that would be necessary to support its drilling and production business.

122.    Commencing in or about early to mid-2006, Chesapeake Appalachia and Anadarko E&P, each acquired hundreds of oil and gas leases to properties in Bradford County and adjacent portions of Sullivan, Susquehanna and Wyoming Counties, by entering into such leases either directly or through agents or affiliates or agents, and by acquiring leases from other lessee entities.

123.    Both Anadarko Petroleum (the ultimate corporate parent of Anadarko E&P) and Chesapeake Energy (the ultimate corporate parent of Chesapeake Appalachia) targeted Bradford County, Pennsylvania for an aggressive lease acquisition program, and for development of the natural gas gathering systems that would be necessary to support its drilling and production business.

124.    Beginning in or about 2006, Anadarko E&P acquired hundreds of oil and gas leases to properties in Bradford County, Pennsylvania, and in surrounding counties, both by entering into such leases itself and through T.S. Calkins.

**F.** **Anadarko and Chesapeake Enter Into a Joint Exploration Agreement and Establish the AMI.**

125.   On information and belief, Anadarko E&P entered into a 50/50 Joint Exploration Agreement dated September 1, 2006 with Chesapeake Energy and/or Chesapeake Appalachia (and/or its affiliates) (the "Joint Exploration Agreement"), covering portions of Bradford, Sullivan, Susquehanna and Wyoming Counties within an area of mutual interest that the parties to the agreement as "Area A" (previously defined as the "AMI"), and agreed that Chesapeake Appalachia would serve as the operator of the leases within the AMI. Pursuant to the agreement, Anadarko E&P also assigned, subject to certain reservations and exceptions, fifty percent (50%) of its right, title and interest in and to the Leases under which Plaintiffs hold royalty interests to Chesapeake Appalachia, pursuant to a series of Partial Assignments of Oil and Gas Leases.

126.   Anadarko E&P and the Chesapeake Defendants have peculiar knowledge of the terms of the Joint Exploration Agreement, and any contemporaneous related agreements, which have not been publicly filed or disclosed by any of them.

127.   On information and belief, the Joint Exploration Agreement, or separate contemporaneous or subsequent agreements, also provided that Chesapeake or one or more of its affiliates would be an owner, and the operator, of gathering systems to be constructed to service the anticipated wells to be drilled by or on behalf

of Chesapeake Appalachia, and that Anadarko E&P or its affiliates would receive a proportionate ownership interest in the anticipated gathering systems and pipelines.

128.   Initial construction of gathering and midstream assets within the AMI commenced in or about May 2008.

### G.    The Anticompetitive Market Allocation Agreement

On information and belief derived in part from the Second Amended Complaint in the OAG Action, the Chesapeake Defendants and the Anadarko Defendants, contemporaneous with or following the commencement of their joint venture, but separate and apart from the Joint Exploration Agreement, agreed to allocate and assign exclusive territories to each other for the acquisition of oil and gas leases, as part of a separate market allocation agreement, allocating  Bradford, Sullivan, Tioga and Wyoming Counties to the Chesapeake Defendants, and Clinton, Lycoming and Potter Counties to the Anadarko Defendants. On information and belief, the market allocation agreement was oral.

### H.    The Joint Venture Between Chesapeake and Statoil

129.   In November 2008, Chesapeake Energy and/or certain of its affiliates entered into an industry participation agreement (commonly referred to as a joint venture) with Statoil ASA ("Statoil"), the parent of defendant Statoil USA, and/or one or more of its subsidiaries, pursuant to which Chesapeake Appalachia assigned to Statoil USA a minority interest in Chesapeake Appalachia's leaseholds, producing

properties and other assets located in the Marcellus Shale play (including working interests in the leases in which Plaintiffs hold royalty interests, as well as ownerships interest in certain gathering systems) in consideration for an upfront cash payment of $1.250 billion plus a commitment by Statoil to pay 75% of Chesapeake's drilling and completion costs in the play until $2.125 billion has been paid. Pursuant to the Participation Agreement and ancillary agreements, Chesapeake Appalachia serves as the operator, and conducts all leasing, drilling, completion, operations and marketing activities in connection with the Statoil joint venture.

## I.   Anadarko Enters Into a Joint Venture With Mitsui, and Assigns Working Interests in Its Leases to Mitsui E&P.

130.   Anadarko E&P subsequently entered into a joint venture with Mitsui E&P, in the form of an Appalachian Area Participation Agreement, dated effective January 1, 2010, and also assigned, subject to certain reservations and exceptions, an undivided fifty percent (50%) interests in its right, title and interest in and to the Leases under which Plaintiffs hold royalty interests, to Mitsui E&P, pursuant to a series of Partial Assignments of Oil and Gas Leases.

## J.   Plaintiffs' Royalty Interests

131.   Each of the Plaintiffs, or their respective predecessor(s) in interest, entered into a fully paid up oil and gas lease with Anadarko E&P on the dates and for the leased premises indicated below, pursuant to which the respective Plaintiffs

hold royalty interests in the natural gas produced and marketed from the leases premises:

| PLAINTIFF(S) | LEASED PREMISES | ORIGINAL LESSOR(S) | LEASE DATE |
|---|---|---|---|
| Robert C. Abrams, Jr., & Sonya M. Abrams | Abrams Property | Plaintiffs | 4/22/2006 |
| James M. Allen | Allen Property | James M. Allen & Jeffrey P. Allen | 2/21/2006 |
| Theodore R. Babcock & Connie R. Babcock | Babcock Property | Robert M. Babcock, Theodore R. Babcock & Connie R. Babcock | 6/3/2006 |
| Dale G. Bennett & Donna M. Bennett, Individually and t/a D+D Bennett Partners, LP | D+D Bennett Partners LP Property | Dale G. Bennett & Donna M. Bennett | 4/17/2006 |
| Thomas E. Blanchard & Margaret K. Blanchard | Blanchard Property | Plaintiffs | 7/19/2006 |
| William T. Bohensky, Jr., & Laura G. Bohensky | Bohensky Property | Plaintiffs | 5/2/2006 |
| Jan Robert Brown | Jan Brown Property | Plaintiff | 6/15/2006 |
| Marilyn Bryan a/k/a Marilyn H. Snyder Bryan & Thomas Bryan | Snyder/Kisner/Bryan Property | Plaintiffs | 8/13/2006 |
| John Burke | Burke Property | Robert Ely | 6/14/2006 |
| Ty C. Cobb | Cobb Property 1 | Plaintiff | 3/10/2006 |
| | Cobb Property 2 | Plaintiff | 3/10/2006 |
| Jack C. Corbett & Janice C. Corbett | Jack & Janice Corbett Property | Plaintiffs | 7/26/2006 |
| Kim R. Corbett & Debra C. Jones | Jack & Janice Corbett Property | Jack R. Corbett & Janice C. Corbett | 7/26/2006 |

| Wayne M. Cummiskey & Andrae L. Cummiskey | Cummiskey Property | Plaintiffs | 5/9/2006 |
|---|---|---|---|
| Roberta F. Davis | Roberta Davis Property | Charles Davis a/k/a Charles H. Davis & Plaintiff | 5/20/2006 |
| Roberta Jean Pennay Dyer | Roberta Dyer Property | Plaintiff & Allen D. Dyer | 6/29/2006 |
| Lyle R. Fenton | Fenton Property 1 | Plaintiff | 6/6/2006 |
| | Fenton Property 2 | Plaintiff | 6/23/2006 |
| William David Gilbert & Jennifer Gilbert | Gilbert Property | Plaintiffs | 5/5/2006 |
| Gary L. Hall | Gary Hall Property | Shirley L. Jackson | 7/12/2006 |
| Joshua L. Hees & Tamara O. Hees | Hees Property | Kent L. Morgan & M. Patricia Nelson | 4/26/2006 |
| Raymond Henninger, Jr. | Henninger Property | Plaintiff | 3/22/2006 |
| Richard R. Higley & Charlotte L. Higley, Individually and t/a Higley Tall Spruce LLC | Richard & Charlotte Higley Property | Richard R. Higley & Charlotte L. Higley | 3/22/2006 |
| JEMSCO Star, LLC | Jones Property 1 | Wanda L. Jones a/k/a Wanda Lee Jones and Frank H. Jones a/k/a Francis H. Jones, Jr. | 4/15/2006 |
| | Jones Property 2 | Frank Jones and Wanda Jones | 4/29/2006 |
| Edward S. Kalinowski | Kalinowski Property | Plaintiff | |
| Marjorie E. Snyder Kisner & Jesse Kisner | Snyder/Kisner/Bryan Property | Plaintiffs | 8/13/2006 |
| Anthony J. Latini & Melissa L. Latini | Latini Property | Plaintiffs | 5/10/2006 |
| Latini Management, LLC t/a Latini Resources, LP | Latini Property | Anthony J. Latini & Melissa Latini | 5/10/2006 |

| | | | |
|---|---|---|---|
| Michael J. McGroarty a/k/a Michael McGroarty and Margaret M. McGroarty | McGroarty Property | Plaintiffs | 3/25/2006 |
| Edward F. McKernan & Deborah H. McKernan; Joseph E. McKernan; & Joseph T. McKernan | McKernan Property | Todd L. McKernan; Edward F. McKernan & Deborah H. McKernan; Joseph E. McKernan & Patricia L. McKernan | 7/14/2006 |
| Earl C. Miller & Ann L. Miller | Miller Property 1 | Plaintiffs | 3/18/2006 |
| | Miller Property 2 | Charles Earl Miller | 3/18/2006 |
| Gary R. Norconk, Sharon M. Norconk & Linda L. Kisner, Individually and t/a Norconk Family Limited Partnership | Norconk Property | Raymond Norconk a/k/a Raymond C. Norconk & Shirley Norconk | 5/7/2006 |
| Raymond J. Raffin and Mary Ann Raffin, as Trustees of The Raffin Family Trust, and as Trustees of The Raymond J. and Mary Ann Raffin Gas Protector Trust | Raffin Properties | Raymond J. Raffin & Mary Ann Raffin, as Trustees of The Raffin Family Trust | 7/28/2006 |
| April A. Rine & Jeffrey J. Rine | Rine Property | Plaintiffs | 4/29/2006 |
| Joyce Ann Rohe | Rohe Property | Plaintiff | 8/16/2011 |
| Melvin R. Rohe, Jr. | Rohe Property | Plaintiff | 8/16/2011 |
| Michael B. Saxe, Individually and t/a Marcellus Five Family Limited Partnership | Marcellus Five FLP Property 1 | Michael B. Saxe & Sandra M. Saxe | 4/27/2006 |
| | Marcellus Five FLP Property 2 | Michael B. Saxe & Sandra M. Saxe | 4/27/2006 |

| | | | |
|---|---|---|---|
| Thomas Schmeckenbecher, Individually and t/a Thomas Schmekenbecher Family, LP | Schmeckenbecher Property | Thomas & Daniel Schmeckenbecher | 3/24/2006 |
| Scott R. Shores & Laura K. Shores | Shores Property 1 | Plaintiffs | 6/5/2006 |
| | Shores Property 2 | Plaintiffs | 6/5/2006 |
| James Swingle, Jr. & Susan Swingle | Swingle Property | Plaintiffs | 3/29/2008 |
| Susan Swingle | Rohe Property | Plaintiff | 8/16/2011 |
| Betty J. Them | Betty Them Property 1 | Theodore R. Them & Betty J. Them | 6/22/2006 |
| | Betty Them Property 2 | Shirley L. Jackson | 7/12/2006 |
| William W. Them, Trustee of the William W. Them Living Trust | William Them Property | Plaintiff | 7/12/2006 |
| Towanda Country Club | Towanda Country Club Property | Plaintiff | 8/24/2006 |
| Robert W. Watkins | Watkins Property | Plaintiff | 8/4/2006 |
| Wickward Management, LLC t/a Wickward Resources, LP | Wickward Resources, LP Property | Kenneth H. & Julie Howard | 6/30/2006 |
| Gary Wickwire | Gary Wickwire Property 1 | Plaintiff | 4/7/2006 |
| | Gary Wickwire Property 2 | | |
| Scott A. Wickwire, Individually and t/a Wickwire Family Limited Partnership | Wickwire FLP Property | Scott A. Wickwire & Sandra S. Wickwire | 6/5/2006 |
| Chuck Will a/k/a Charles Will | Will Property | Plaintiff | 7/14/2006 |

132.   Each of the following Plaintiffs or their respective predecessors in interest entered into a fully paid up oil and gas lease with T.S. Calkins, to which Anadarko E&P is the successor in interest, pursuant to which the respective Plaintiffs hold royalty interests in the natural gas produced and marketed from the leases premises:

| PLAINTIFF(S) | LEASED PREMISES | ORIGINAL LESSOR(S) | LEASE DATE |
|---|---|---|---|
| Charles W. Brown | Charles Brown Property | Plaintiff | 12/20/2005 |
| Lynn H. Kinch & Gail Kinch | Kinch Property | Plaintiffs | 2/20/2006 |
| Randy L. Morse & Virginia K. Morse | Morse Property | Plaintiffs | 1/17/2006 |
| Kevin R. Potter & Donna E. Potter, Individually and t/a K&D Acres, F.L.P. | Potter Property | Kevin R. Potter & Donna E. Potter | 3/1/2006 |

133.   The Oil and Gas Leases described in which the respective Plaintiffs hold royalty interests above are sometimes referred to below collectively as "Plaintiffs' Leases" or the "Leases."

134.   Each of the Leases was executed using a preprinted form provide by the original lessor, or an agent acting on its behalf. Some of the Leases also include addenda containing additional provisions which amend, modify or supplement provisions contained in the preprinted body of the Lease.

### K.      The Royalty Provisions in Plaintiffs' Leases

135.     Anadarko E&P and T.S. Calkins each used substantially the same preprinted form of Lease in connection with each Lease that it entered into with one of the Plaintiffs, or with his, her or its predecessor in interest, each of which contains the following provisions regarding royalties:

> A.     The LESSEE covenants and agrees as follows:
>
> 1st – LESSEE … shall pay the LESSOR on gas … produced from the premises and used off the premises or lands pooled therewith or in the manufacture of gasoline, or other products therefrom, or sold (whether to an affiliated or non-affiliated purchaser) the market value at the well of one-eighth (1/8th) of the gas so used or sold. In no event shall the gas royalty payable hereunder be computed on the basis of a price the collection of which by LESSEE is unlawful or prohibited by order or regulation of any governmental authority having jurisdiction, and market value at the well shall not exceed the amount realized by LESSEE for such production computed at the well…. LESSEE may pay all taxes and fees levied upon LESSOR's royalty share of production of oil and gas and deduct the amount so paid from any monies payable to LESSOR hereunder….
>
> *          *          *          *
>
> B.     It is mutually agreed by and between LESSOR and LESSEE as follows:
>
> 6th – LESSEE is hereby granted the right to pool or unitize all or any part of the premises with any other leases, lands, oil or gas estates, or any of them whether owned by the LESSEE or others, so as to create one or more drilling or production units. Such units shall not exceed 640 acres in

extent provided, however, that if any Federal or State law, Executive order, rule or regulation shall prescribe a spacing pattern for the development of the field or allocate a producing allowable on acreage per well, then such units may embrace as much additional acreage as may be prescribed or as may be use in such allocation or allowable. LESSEE shall record a copy of the unit operation designation in the county in which the premises are located…. As to each such unit, LESSOR agrees to accept, in lieu of the royalty herein described, such proportion of such royalty as the acreage in the premises in such unit bears to the total acreage included in such unit….

136.  Certain of Plaintiffs' Leases include addenda or exhibits which contain language increasing the royalty rate specified in the body of the preprinted form of Lease to a higher specified rate.

### L.  The Pooling and Unitization of the Leaseholds and Commencement of Production of Natural Gas.

137.  Following the execution of the Leases of the respective Plaintiffs, or their predecessors in interest, the Lessee Defendants pooled, unitized and combined each of the respective Leases, along with the lands covered by the Lease and the oil and gas estates therein, with other properties, into one or more production units, and commenced the drilling of one or more wells in each unit and the production of gas from such wells, on dates that varied by Lease and by well.

138.  Following the commencement of production of gas from the wells drilled in each unit into which all or any portion of each Lease was combined, the

Lessee Defendants began accounting for and paying royalties to those Plaintiffs who had acreage covered by a Lease under which they held royalty interests included in the unit.

**M.    The Royalty Provisions of Plaintiffs' Leases Do Not Permit the Lessee Defendants to Deduct Post- Production Costs.**

139.    In calculating and paying royalties to Plaintiffs on gas produced from the Leaseholds in which they hold royalty interests, the Lessee Defendants have deducted, and continue to deduct, from the revenue realized by them from gas produced and marketed from the Leasehold premises, purported post-production costs, including but not limited to the purported cost to gather and transport the gas, in calculating the royalties payable to Plaintiffs, even though such deductions are not permitted by the Leases.

140.    Gathering is the collection and movement of gas from the point of production (the wellhead), through the use of field pipeline systems and facilities, to a transmission or transportation pipeline, through which the gas is then transported to the market.

141.    Plaintiffs believe, understand and aver that the term "transport", as used (but not defined) in Plaintiffs' Leases, means, and is subject to being reasonably construed, understood and interpreted to mean, the movement of gas through transmission or transportation pipelines only – a function which is and is commonly understood to be separate and distinct from gathering.

60

142.   Gathering pipelines usually are relatively smaller in diameter, move gas shorter distances, and operate at relatively lower pressure, than transmission pipelines.

143.   Transmission pipelines, on the other hand, usually are relatively larger in diameter, move gas longer distances, and operate at relatively higher pressure, than gathering pipelines and facilities.

144.   The Leases do not expressly or by necessary implication permit the original Lessor or any of the Lessee Defendants to deduct any costs for gathering, marketing or transporting the gas produced from the premises and sold off the premises, or any other post-production costs, in calculating the royalties payable to Plaintiffs from revenue realized by them for gas produced and marketed from the respective Leaseholds the cost to gather the gas.

145.   By deducting the cost to gather and transport gas produced from the leasehold premises, in calculating and paying royalties to Plaintiffs, the Lessee Defendants have breached the Leases.

### N.   Chesapeake Determines the Royalties It Pays to Plaintiffs Based on Self-Dealing.

146.   Chesapeake has used, and continues to use, non-arms'-length contracts and transactions with its own subsidiaries and affiliates to produce, process and market the gas in which Plaintiffs' own royalty interests. Chesapeake also has used

artificially constructed "prices," to determine the royalties payable to Plaintiffs in connection with such gas.

147.    After gas is produced from a well, Chesapeake Appalachia purportedly sells the gas to its affiliate, CEMI, in a transaction which is not at arms'-length. The Chesapeake Defendants have represented that CEMI takes title to and possession of the gas at the wellhead. Access Midstream (formerly known as Chesapeake Midstream Partners, L.P.), aggregates, commingles and gathers the gas with gas produced from multiple other wells subject to other leases into a downstream pool, and transports the commingled gas to a central point. CEMI then delivers the gas to one of several "points of delivery," which are physical locations where Access Midstream's system connects to larger interstate pipelines owned and operated by unaffiliated third party interstate pipeline companies. The gas is then transported downstream from these points of delivery to various "points of sale." It is only at these points of sale that title to the gas passes from CEMI to third-party purchasers.

148.    According to written statements previously made by Chesapeake Energy in correspondence to royalty interest owners, CEMI determines a weighted average sales price (sometimes referred to by the acronym "WASP") for the gas sold from the pool on a monthly basis. CEMI purportedly calculates the WASP by averaging the price received by CEMI from individual sales from the pool across the entire volume contained in the pool. CEMI then purportedly pays Chesapeake

Appalachia 97% of the sales price that CEMI receives in third-party sales, retaining a 3% "marketing fee," which is purportedly borne solely by Chesapeake Appalachia, and not passed-along to Plaintiffs, *less* the costs CEMI incurs between the initial point of sale (the wellhead) and what it characterizes as the "value-added downstream points of sale," which include a compression fee, a gathering fee and a transportation fee.

149.   Chesapeake makes royalty payments to owners of royalty interests, including Plaintiffs, based on a weighted average sales price calculated on these sales to various third party purchasers.

150.   In reality, Chesapeake receives a much higher "effective" price for gas produced under Leases in which Plaintiffs hold royalty interests than the WASP it uses to calculate the royalties payable to Plaintiffs.

151.   On information and belief, Chesapeake purports to sell certain of the gas produced under Plaintiffs' Leases pursuant to forward future contracts, called prompt month contracts (with smaller amounts sold each month at spot prices, or pursuant to same-day contracts).

152.   Because Chesapeake knows that prompt month futures contracts typically bring lower prices than longer-term contracts, and because of the high volatility of the market for prompt month future contracts, Chesapeake also bought and sold derivatives (puts, calls, collars, options) of farther forward sales of gas to

to lock-in significantly higher prices for gas produced in the Marcellus Shale region, including gas produced under Plaintiffs' Leases.

153.   Chesapeake does not, however, calculate or pay royalties based on the substantially higher "effective" price it receives for its physical production of gas, but instead uses the substantially lower, artificial WASP.

### O.   The Lessee Defendants Deducted Arbitrary, Excessive and Unreasonable Amounts for Gathering and Other Post-Production Services.

154.   In addition to acquiring oil and gas leases and producing natural gas in the Marcellus Shale region, Chesapeake Energy, through various of its subsidiaries, also invested in, developed and operated gathering systems and processing facilities to gather, treat and process the natural gas that it produced.

155.   On February 29, 2008, Chesapeake Energy formed Chesapeake Midstream Development, L.P. ("CMD"), to own, operate and develop midstream energy assets.

156.   In September 2009, Chesapeake Energy and Global Infrastructure Partners-A, L.P, and affiliated funds managed by Global Infrastructure Management, LLC, and certain of their respective subsidiaries and affiliates (collectively, "GIP"), formed a joint venture to own and operate natural gas midstream assets. As part of the transaction, CMD contributed certain natural gas gathering systems (which, on information and belief, did not include Marcellus

Shale midstream assets) to the newly formed joint venture entity, and GIP purchased an interest for $588 million in cash.

157.   In 2010, Chesapeake Energy and GIP formed Chesapeake Midstream Partners, L.P. ("CHKM"), a master limited partnership, to own, operate, develop and acquire gathering systems and other midstream energy assets.

158.   CHKM completed its initial public offering of common units on August 3, 2010. In connection with the closing of the public offering, Chesapeake Energy and GIP contributed the interests of the midstream joint venture's operating subsidiary to CHKM.

159.   Prior to the end of 2011, Chesapeake Energy provided gas gathering and related post-production services to the Lessee Defendants and others in the Marcellus Shale region through its own subsidiaries and affiliates, initially including, but not limited to, CMD and one of CMD's subsidiaries, Appalachia Midstream Services, L.L.C. ("Appalachia Midstream").

160.   The post-production costs which the Lessee Defendants began to deduct from proceeds received by them at the point of sale in calculating the royalties payable to Plaintiffs were based largely (but not entirely) on purported post-production services by Chesapeake affiliates and subsidiaries, in self-dealing, related party transactions.

161.   Although the royalty statements that the Lessee Defendants issued to Plaintiffs provided only cursory, cryptic and confusing descriptions of the deductions taken from the proceeds received by the Lessee Defendants at the point of sale in calculating the royalties payable to the respective Plaintiffs on gas produced from their respective properties, Plaintiffs believe and aver that, even if the Lessee Defendants otherwise were authorized to take such deductions (which Plaintiffs dispute), many of the deductions taken by the Lessee Defendants in connection with the underlying self-dealing, related party transactions were arbitrary, excessive and unreasonable in amount.

### P.   Chesapeake's Liquidity Crisis

162.   Chesapeake financed its aggressive campaign to acquire leases in the Marcellus Shale region and in other parts of the country by incurring massive amounts of debt, resulting in it having a an unusually highly leveraged balance sheet, and increasingly onerous and ongoing debt servicing and repayment obligations. By the end of 2011, Chesapeake owed approximately $10 billion in debt.

163.   By the end of 2011, however, Chesapeake found itself faced with a liquidity crisis, precipitated by an unexpected decline in the market price for natural gas, which threatened Chesapeake's ability to continue to service and refinance or pay the massive debt obligations on its highly-leveraged balance sheet. As described by a journalist writing for Forbes:

Chesapeake Energy is in a bind. It's the second-biggest natural gas producer in the country after ExxonMobil. But with natgas prices having fallen to their lowest levels in a decade ($2.40 per thousand cubic feet), Chesapeake isn't generating enough cash.

Chesapeake has curtailed its drilling in some plays, and in January said it would shut in production of marginal gas fields. But the company has $10 billion in debt to service and is obligated to keep drilling wells on newer oil and gas leases in order to hold the land. Over the course of 2012, if gas prices were to stay where they are now, Chesapeake would face a cash shortfall of several billion dollars.[4]

**Q.     Chesapeake's Scheme to Use Gas Gathering and Related Agreements to Solve Its Liquidity Crisis.**

164.    As part of its efforts to address its impending liquidity crisis, Chesapeake decided to "sell" certain of its midstream assets, including its natural gas gathering system and intrastate pipeline operations in the Marcellus Shale region, through a series of complex and unusual transactions with Access Midstream.

165.    On December 29, 2011, CHKM acquired from CMD all of the issued and outstanding equity interests in Appalachia Midstream, for total consideration of $879.3 million, consisting of 9,791,605 common units and $600.0 million in cash.

---

[4]     Christopher Helman, *Chesapeake Energy's New Plan: Desparate Measures for Desparate Times*, (Forbes Feb. 13, 2012) (the "Forbes Article"). http://forbes.com/sites/christopherhelman/2012/02/13/chesapeake-energys-new-plan-desparate-measures-for-desparate-times/

166.   As of its acquisition by CHKM, Appalachia Midstream operated 100 percent of, and owned an approximate average 47 percent interest in, 10 integrated gas gathering systems that consisted of approximately 549 miles of gas gathering pipeline in the Marcellus Shale, which serviced (and continue to service) approximately 250 natural gas wells. The remaining 53 percent interest in the assets was owned, directly or through subsidiaries and affiliates, primarily by Statoil ASA, Anadarko Petroleum, and Mitsui & Co., Ltd., which were and are, respectively, the corporate parents of defendants Statoil USA, Anadarko E&P and Mitsui E&P.

167.   Appalachia Midstream was and is party to long-term (15-year) gas gathering agreements with certain subsidiaries and affiliates of Chesapeake, and also with Statoil USA, Anadarko E&P, Mitsui E&P, Epsilon Energy Ltd., and Chief Oil & Gas LLC ("Chief"). Pursuant to these gas gathering agreements, which are not publicly available, and the terms of which Chesapeake maintains as confidential, Chesapeake and some or all of the other producer-parties to the agreements granted Appalachia Midstream what CHKM has publicly characterized as "extensive acreage dedications" (i.e., exclusivity) in the areas within which it operated in the Marcellus Shale region.[5]

---

[5]      *See* Chesapeake Midstream Partners, L.P., SEC Form 8-K, filed February 1, 2012, Ex. No. 99.1, at 1-2.
https://www.sec.gov/Archives/edgar/data/1483096/000119312512034455/d292771d8k.htm
https://www.sec.gov/Archives/edgar/data/1483096/000119312512034455/d292771dex991.htm
Chesapeake Midstream Partners, L.P. SEC Form 10-K, filed February 29, 2011, at 1-3.
https://www.sec.gov/Archives/edgar/data/1483096/000119312512089268/d283045d10k.htm

168.   Although the terms of the gas gathering agreements were and are largely confidential, and not publicly available, CHKM has publicly disclosed that its gas gathering agreements generally contain certain terms, including the following:

- opportunity to connect natural gas drilling pads and wells of the counterparties of these agreements within our acreage dedications to our gathering systems in all of our regions; [and]

- fee redetermination mechanisms, which are designed to support a return on invested capital and allow our gathering rates to be adjusted, subject to specified caps in certain cases, to account for variability in revenues, capital, expenditures and compression and certain other expenses….[6]

169.   The long-term gas gathering agreements functioned to limit (if not to entirely eliminate) any direct exposure and risk to Appalachia Midstream and CHKM from changes in the market price of natural gas .

170.   Effective July 24, 2012, CHKM changed its names to Access Midstream Partners, L.P.

171.   On December 20, 2012, Access Midstream acquired from CMD and certain of CMD's affiliates one hundred percent (100%) of the issued and outstanding equity interests in Chesapeake Midstream Operating, L.L.C. ("CMO") for total consideration of $2.16 billion (the "CMO Acquisition"). Through the CMO

---

[6] Chesapeake Midstream Partners, L.P., SEC Form 10-K, filed February 29, 2011, at 2.

Acquisition, Access Midstream acquired certain midstream assets in the Eagle Ford, Utica and Niobrara regions, and also extended its existing assets and operations in the Marcellus and other regions. Access Midstream also assumed various gas gathering and processing agreements associated with the assets that have terms ranging from 10 to 20 years and that, in certain cases, include cost of service or fee redetermination mechanisms.

172.   When Chesapeake sought to spinoff its gathering assets, it turned to J. Michael Stice – who then served as Chief Executive Officer of Chesapeake Midstream GP, L.L.C (the general partner of CHKM), as Senior Vice President— Natural Gas Projects of Chesapeake Energy, and as President and Chief Operating Officer of Chesapeake's primary midstream subsidiaries – to run the operation. Stice became the Chief Executive Officer of Access Midstream upon its acquisition of the CMO midstream assets.

173.   Dominic J. Dell'Osso, Jr. – who then served as the Executive Vice President of Chesapeake, and who had served as the Chief Financial Officer of Chesapeake Midstream from August 2008 to November 2010 – also was fully familiar with and intimately involved in the scheme.

174.   Stice and Dell'Osso also served as directors of Access Midstream's general partner, Access Midstream Partners GP, L.L.C., since July 2012 and July 2011, respectively.

175.   According to the *ProPublica* Report, post-spinoff agreements between Chesapeake and Access Midstream also guarantee that Chesapeake and certain of its subsidiaries and affiliates would receive a rebate of some of the monies that they pay out to Access Midstream, in the form of payments for services and additional assets.[7]

176.   As part of the transaction, Chesapeake agreed that certain of its personnel and employees would be made available to Access Midstream during a transitional period, and that it would provide certain services to Access Midstream (for which it would be paid) going forward.[8]

177.   As a result, Access Midstream has been and continues to be managed and directed by former or current Chesapeake officer, has made extensive use of other Chesapeake employees in conducting its operations, and continues to pay Chesapeake and certain of its affiliates and subsidiaries for a variety of services.

178.   In connection with the CMO Acquisition, Access Midstream not only acquired existing gas gathering agreements, but also entered into certain new gas gathering agreements (the "New Gas Gathering Agreements") with certain Chesapeake Energy subsidiaries, including Chesapeake Appalachia.[9]

---

[7]      *See ProPublica* Report.

[8]      Access Midstream Partners, L.P., Form 10-K, filed Feb. 25, 2013; *see also* Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed Dec. 19, 2012; Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed June 20, 2012

[9]      *See* Access Midstream SEC Form 8-K, filed December 19, 2012, at 2-5. http://www.sec.gov/Archives/edgar/daa/1483096/00119312514085/d457818d8k.htm

**R.** **Defendants Leverage Their Monopoly Power Over Gathering and Intrastate Transportation Pipeline Systems In Contractually Dedicated Areas to Enable Chesapeake to Address Its Liquidity Crisis, and to Enable Access Midstream to Generate Supra-Competitive Profits, at the Expense of Plaintiffs and Other Royalty Interest Owners.**

179. Chesapeake and Access Midstream sought and received from the SEC confidential treatment of the New Gas Gathering Agreements, and have not otherwise made the agreements public. As a result, Plaintiffs do not presently have access to or knowledge of all of the terms and conditions of the New Gas Gathering Agreements, which are within the exclusive knowledge of Chesapeake, Access Midstream and the SEC (subject to confidentiality). As set forth below, however, certain terms of the New Gas Gathering Agreements have been described in public filings by Chesapeake Energy and Access Midstream, and in the *ProPublica* Report.

180. Under both the existing gathering agreements acquired by Access Midstream from CMD and its affiliates, and the new gathering agreements established and entered into in connection with the CMO Acquisition, CMD and other affiliates of Chesapeake "agreed to procure gathering, compression, dehydration and treating services" for natural gas produced in the "Dedication Areas" specified in the respective gathering agreements, *exclusively* from Access Midstream.[10]

---

[10]     *See* Access Midstream Partners, L.P., SEC Form 8-K (filed Dec. 26, 2012) https://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm

181.  By engaging in CMO Acquisition and related transactions, Access Midstream effectively acquired a monopoly in the market for gathering, compression, dehydration and treating services within the "Dedication Areas" specified in its existing and new gathering agreements, for at least the duration of the long-term gathering agreements.

182.  Although Plaintiffs do not have access to the gathering agreements that cover the natural gas produced from their properties by Chesapeake, Plaintiffs believe and aver that much of Bradford County, including all of Plaintiffs' properties that are subject to Leases with Chesapeake, falls within Dedication Areas specified in one or more of the gathering agreements transferred or established as part of the CMO Acquisition.

183.  In its public filings with the SEC, Access Midstream acknowledges that, because it has long-term gathering agreements with its producer customers, including Chesapeake, which have provided it with "long term acreage dedications," it faces no competition within such acreage dedications:

> Given that substantially all of the natural gas gathered and transported through our gathering systems and processing facilities is owned by producer customers with whom we have long-term gathering contracts, we do not currently face significant competition for our natural gas volumes…. Chesapeake and other producers have

---

Exhibit 10.1 (Non-Solicitation Agreement , dated as of Dec. 20, 2012), at 1-2
https://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818dex101.htm

provided long-term acreage dedications in the Marcellus Shale region….

We face competition for production drilled outside of our acreage dedications and in attracting third-party volumes to our systems.[11]

184.   In other words, by virtue of its long-term exclusive contracts with Chesapeake and other producers in the Marcellus Shale region, **Access Midstream effectively has a one hundred percent (100%) share of the market for gas gathering and related post-production services in the relevant geographic market.**

185.   There were and are no economically practicable or reasonable means for a prospective competitor to enter into the market to compete with Access Midstream in the delivery of gas gathering and related post-production services in the relevant geographic market. The barriers to entry into the market include: (a) the substantial capital costs and regulatory barriers associated with the construction and operation of the necessary gathering pipelines; and (b) Access Midstream's long-term exclusive contracts with Chesapeake, the dominant producer in the relevant geographic market, and other producers in the market. As a result, Access Midstream acquired in the CMO Acquisition, and continues to possess, effective monopoly

---

[11]      Access Midstream Partners, L.P. Form 10-K (filed Feb. 21, 2014), at 8. https://www.sec.gov/Archives/edgar/data/1483096/000156459014000295/acmp-10k_20131231.htm

power in the market for gas gathering and related post-production services in the relevant geographic market, as defined by the exclusive dedicated acreage granted in its long-term gathering agreements.

186.   The New Gas Gathering Agreements included agreements between Access Midstream and Chesapeake Appalachia for the gathering of natural gas produced by Chesapeake Appalachia from its operations the Marcellus Shale Region (the "Marcellus Gas Gathering Agreements").[12] Under the Marcellus Shale Gas Gathering Agreements, Chesapeake Appalachia's payments to Access Midstream for gas gathering and transportation services were referred to as the "Marcellus fee." *Id.*

187.   Access Midstream attempts to characterize of the amounts that Chesapeake Appalachia has been required to pay for gas gathering and transportation services (which Access Midstream sometimes refers to as the "Marcellus fee") as a "cost-of-service based fee." This characterization, however, is false and misleading.

188.   As the *ProPublica* Report details, the fees charged to Chesapeake Appalachia by Access Midstream for purported post-production services were not and are not "cost-of service based," but instead were and are based on a transaction structured to provide Access Midstream with a long-term, guaranteed, above-market

---

[12]   *See* Access Midstream SEC Form 8-K, filed December 19, 2012, at 5

return on its investment, as an incentive and as consideration for the payments it made to Chesapeake. As explained by *ProPublica*, "[a]n executive at a rival company who reviewed the deal at ProPublica's request said it looked like **Chesapeake had found a way to make the landowners pay the principal and interest on what amounts to a multi-billion dollar loan to the company from Access Midstream.**"[13]

189.   Access Midstream's own public disclosures show that the fees paid to it in connection with the Marcellus Gathering Agreement are not based on the cost of the gathering services provided under the agreement. To the contrary, according to Access Midstream, the agreement is a long-term agreement that guarantees it a specified rate of return on its investment:

> Effective on January 1, 2014 and January 1st of each year thereafter for a period of 15 years from July 1, 2012, the Marcellus fee will be redetermined based on a cost-of-service calculation that provides a specified pre-income tax rate of return on invested capital.[14]

190.   Although neither Chespeake nor Access Midstream filed the Marcellus Gathering Agreement with the SEC, *ProPublica* has reported that the rate of return guaranteed to Access Midstream is 15% per year: "Chesapeake has pledged to pay

---

[13]   *See ProPublica* Report.

[14]   Access Midstream SEC Form 8-K, filed Dec. 19, 2012, at 5
http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm

Access enough in fees to **repay the $5 billion plus a 15 percent return** on its pipelines."[15]

191.   Both Chesapeake and Access Midstream acted with full knowledge that the rate of return being guaranteed to Access Midstream was well in excess of the rate of return that would have been available in a competitive market.   Both Chesapeake and Access Midstream also acted with full knowledge that, in the absence of sudden and unanticipated increases in the market price of natural gas, and in light of the condition of Chesapeake's cash flow and balance sheet, Chesapeake's ability to deliver on its promise to provide Access Midstream with an above-market rate of return would require Chesapeake to treat the payments that it would be making to Access Midstream as purported post-production costs, and to then deduct and pass-on the artificial purported post-production costs in calculating royalty payments to Chesapeake's lessors, including Plaintiffs, thereby reducing the royalties payable to them.

192.   Both Chesapeake and Access Midstream further acted with full knowledge, and in reliance on the fact, that the resulting purported post-production costs that Chesapeake could and inevitably would have to pass-on to its lessors, including Plaintiffs, would be artificially inflated, and in excess of the true market rates of such services.

---

[15]      *See ProPublica* Report

193. The structure and terms of the CMO Acquisition and related agreements, including the ability to fund the commitments undertaken by Chesapeake at the expense of its royalty interest owners, including Plaintiffs, depended and relied on the existence and abuse by Access Midstream of the monopoly power already possessed by Chesapeake Energy and its subsidiaries in the market for gathering services in the Dedicated Areas, which was effectively conveyed to Access Midstream in connection with the CMO Acquisition, and which was augmented by the new gathering agreement entered into by Defendants and their affiliates as part of the transaction.

194. Defendants acted with the intent of using the artificial reduction of the royalties due and owing to Plaintiffs (and other royalty interest owners) to finance their scheme.

195. In Chesapeake Energy's 2013 Annual Report on Form 10-K, filed with the SEC on February 27, 2014, Chesapeake for the first time publicly disclosed the financial magnitude of the gathering and transportation commitments that it made to Access Midstream in connection with the CMO Acquisition, as well as fact that its royalty interest owners would be bearing a portion of those costs:

> We have contractual commitments with midstream service companies and pipeline carriers for future gathering, processing and transportation of natural gas and liquids to move certain of our production to market. Working interest owners and *royalty interest owners,*

> *where appropriate, will be responsible for their proportionate share of these costs.*[16]

(emphasis added). According to Chesapeake Energy, its aggregate undiscounted commitments under gathering, processing and transportation agreements, "excluding any reimbursement from working interest and royalty interest owners," amounts to a staggering $17 Billion.[17]

196.  Although Plaintiffs believe and aver that Chesapeake was impermissibly deducting inflated and improper post-production costs in calculating their royalties, resulting in the underpayment of royalties, even *before* the CMO Acquisition closed, the problem grew dramatically worse and more evident following the closing of the CMO Acquisition.

197.  As part of the CMO Acquisition, Chesapeake not only agreed to guaranty Access Midstream an above-market rate of return on its investment, but also agreed to pay Access Midstream supra-competitive prices for natural gas gathering services going forward that are many multiples of Access Midstream's actual costs, and far more than the costs previously deducted by Chesapeake

---

[16]     Chesapeake Energy Corporation SEC Form 10-K (filed Feb. 27, 2014), Item 8, Note 4, at 93.(available at  https://www.sec.gov/Archives/edgar/data/895126/000089512614000104/chk-20131231_10xk.htm)

[17]     *Id.*

Appalachia when Chesapeake's own subsidiaries and affiliates owned the gathering system.

198.   The *ProPublica* Report details how Chesapeake has charged and deducted amounts far in excess of not only the market rate, but also far in excess of its own and Access Midstream's actual costs for gathering services. In one example reported by *ProPublica*, the markup was in excess of 3,000%.[18]



### The Great Chesapeake Markup

| 9¢ | 85¢ | $2.94 |
|---|---|---|
| **What it Cost** | **What Chesapeake Paid** | **What They Charged Drake** |
| It cost Access Midstream 9 cents per 1,000 cubic feet (Mcf) to move gas through the pipelines connected to Joe Drake's farm. | Chesapeake paid Access 85 cents per Mcf to move gas through Access's national pipeline network (on average). | Chesapeake then charged Joe Drake $2.94 per Mcf — more than 30 times the actual cost and three times what they paid Access on average — to transfer Drake's gas through the pipeline. |

199.   As also detailed in the *ProPublica* report, Chesapeake sometimes charges and deducts fees at different rates for neighboring lessors with royalty interests in production from the same wells.

200.   Notably, as also mentioned in the *ProPublica* Report, and as reflected in the royalty statements received by many of the Plaintiffs from other oil and gas companies who hold interests in the gas produced from the same wells, Chesapeake reports lower sales prices, and also deducts vastly more for gathering services, than other oil companies which hold participating interests in the same wells, despite the

---

[18]      *See ProPublica* Report.

fact that they share the same contractual royalty payment obligation, and the same entitlement (or lack of entitlement) to take such deductions.

201.   The deductions taken by Chesapeake were and are artificially inflated, improper, and unrelated to any legitimate market "cost of services." Many of the deductions were for purported services which did not enhance the marketability of the gas in which Plaintiffs hold a royalty interest, but instead merely served to enrich the co-conspirators who devised the scheme.

202.   The benefits that Access Midstream derived from the scheme are clear. Access Midstream's predominant source of revenue is gathering fees, and Chesapeake accounts for approximately 84% of Access Midstream's business.[19]

203.   Due in large part to Stice's positive descriptions of, and other disclosures about, the guaranteed revenue stream that Access Midstream would enjoy as a result of the CMO Acquisition, the broader market also plainly understands and appreciates the benefits of the transaction to Access Midstream. As of June 16, 2014, Access Midstream's publicly traded common units (NYSE: ACMP) were trading at $66.57 per share, more than double the price at which they were trading on December 14, 2012, the week before the CMO Acquisition closed.

---

[19]       *Id.*

**FIRST CAUSE OF ACTION**
**(Agreement to Restrain Competition in Violation of**
**Section 1 of the Sherman Act, 15 U.S.C. § 1)**

204.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

205.   Plaintiffs assert this First Cause of Action against each of the Defendants.

206.   The relevant geographic market for purposes of this claim is, in the alternative: (a) Bradford County, Pennsylvania, and adjoining portions of Sullivan, Susquehanna and Wyoming Counties, Pennsylvania; (b) the AMI Alleged in the OAG Action; (c) the AMI designated in the Joint Exploration Agreement between Chesapeake or Chesapeake Appalachia, and/or their respective affiliates, on the one hand, and Anadarko E&P, on the other hand; and/or (d) that portion of the aggregate Dedicated Area, together with any other dedicated acreage defined in any and all gathering agreements to which Chesapeake Energy or any of its affiliates or subsidiaries, including but not limited to CMD, is or was a party, in which they contractually agreed to procure gathering, compression, dehydration or treating services with respect to natural gas exclusively from another entity, and which is located within Bradford, Sullivan, Susquehanna, or Wyoming County, Pennsylvania, including, if and to the extent they fall within the foregoing definition, the Dedicated Areas specified in the following Gathering Agreements listed on

Schedule A to the Non-Solicitation Agreement entered into on December 20, 2012, among Access Midstream, CMD, Chesapeake Operating, Inc., Chesapeake Energy Marketing, Inc., and Chesapeake Energy, filed as Exhibit 10.1 to the SEC Form 8-K filed by Access Midstream Partners, L.P., on December 26, 2012:

- The contracts designed as "5. Marcellus" with a date TBD, with Mid-Atlantic Gas Services, L.L.C., or its successors or assigns;

- The contract designated as "8. Anchor Shipper Gas Gathering Agreement for Marcellus" with an Effective Date of January 1, 2012, with Appalachia Midstream Gas Services, L.L.C., or its successors or assigns; and

- The contract designated as "9. Anchor Shipper Gas Gathering Agreement for Northern Pennsylvania" with an Effective Date of January 1, 2012, with Appalachia Midstream Gas Services, L.L.C., or its successors or assigns; and

The geographic market defined above is referred to below as the "Exclusive Dedicated Acreage." Because there are known to be rich deposits of natural gas in the Marcellus Shale located beneath the surface of the land in and around Bradford County, the relevant geographic market, as alternately defined above, is not reasonably interchangeable with other geographic markets.

207.   The relevant product or service market for purposes of this claim is, in the alternative: (a) the market for the lease of subsurface natural gas underlying specific land, together with the rights to explore for, develop, produce, measure and market gas from the leased premises ("Gas Mineral Rights"); (b) the market for the right to operate working interests in oil and gas leases to explore for, produce and

market natural gas ("Operating Rights"); or (c) the market for natural gas gathering and midstream transportation services ("Gathering Services").

208.   Because natural gas is not readily and reasonably interchangeable with other fossil fuels, such as coal or petroleum, due to various economic, technological and regulatory restrictions, as well as constraints associated with capacity and local transmission and transportation, all of which limit the ability and responsiveness of end-users including electricity generators, and end-users of gas for heating, to respond in the short-term to changes in prices, Gas Mineral Rights likewise are not reasonably interchangeable with similar rights to other forms of fuel, and Operating Rights and Gathering Services are not reasonably interchangeable with other conceivable methods of exploring for, producing and marketing natural gas, or transporting gas from wells to interstate pipelines. As a result, the estimated cross-elasticities of demand, supply and substitution for the alternative products or services are relatively low.

209.   Beginning in 2006, at or about the time of the negotiation of the Joint Exploration Agreement between the Chesapeake Defendants and the Anadarko Defendants, and continuing through at least 2012, the Chesapeake Defendants and the Anadarko Defendants, which otherwise had been, were and continue to be actual and prospective horizontal competitors in the markets for Gas Mineral Rights, Operating Rights and Gathering Services, by and through their respective conduct

set forth above, willfully, knowingly and intentionally combined or conspired, initially among themselves, and later with other oil and gas companies that competed in, or sought to enter, those markets, to reduce, restrain or eliminate competition in the markets for such rights and services by dividing and allocating between themselves separate relevant geographic markets in Northern Pennsylvania, including but not limited to the geographic market in and around Bradford County, between and among themselves, with the specific intent to reduce, restrain or eliminate competition in the markets for such rights and services in the relevant geographic area.

210.   Because the claim set forth in this cause of action is founded on agreements among horizontal competitors to divide and allocate markets, which constitute naked restraints of trade, Plaintiffs respectfully submit that Defendants' conduct described herein constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and therefore should be evaluated under the "per se" rule. Alternatively, if Defendants are able to convince the Court, based on the evidence developed after discovery, that the division and allocation of markets by defendants Chesapeake and Anadarko E&P in connection with their establishment of the AMI referred to as "Area A" was ancillary to some legitimate, pro-competitive business purpose, enhanced overall efficiency, and made markets more competitive, then the claim can and should be analyzed under the rule of reason, which was violated by

the conduct in questions. Because an observer with even a rudimentary understanding of economics could readily conclude that the arrangement in question could have an anticompetitive effect on customers and markets, however, Plaintiffs submit that the conduct at issue can and should appropriately be analyzed under the intermediate "quick look" rule. Under the "quick look rule", the conduct in question constitutes a violations Section 1 of the Sherman Act, 15 U.S.C. § 1.

211.   Chesapeake and Anadarko began by establishing the AMI known as "Area A", which appears to have been intended, and to have operated, to restrict competition between them in the markets for such products and services in the relevant geographic market.

212.   Statoil USA and Mitsui E&P later joined in and provided critical financial support for the conspiracy, acting with knowledge of and with the intent to enable Chesapeake and Anadarko to fully exploit, the anticompetitive and restrictive AMI established pursuant to the 2006 Joint Exploration Agreement. In return for their financial commitments, Statoil USA and Mitsui E&P received working interests in the wells and units developed by Chesapeake Appalachia as the operator, and ownership interests in the gathering systems developed by Chesapeake, AMS and later to facilitate the production and marketing of natural gas from such wells.

213.   As a result of the agreement, combination and conspiracy among the Lessee Defendants and their respective affiliates, which Plaintiffs infer and allege

(based on the apparent ability of Chesapeake Appalachia to exclude other competitors from the relevant geographic market) later came to include other competing oil and gas companies, competition in the markets for Gas Mineral Rights, Operating Rights and Gathering Services in the relevant geographic market was substantially foreclosed or eliminated, leaving the Chesapeake Defendants with an effective monopsony in the market for Gas Mineral Rights and Operating Rights, given that it was effectively the sole buyer of the relevant rights and services in the relevant geographic market.

214.   The effective monopsony held by the Chesapeake Defendants placed them in a position to exercise, and it did exercise, market power over payment of the price of Gas Mineral Rights, including but not limited to royalties.

215.   On information and belief derived from the Amended Complaint in the OAG Action, and from the logical consequences of the conduct, the initial agreement, contract and conspiracy in restraint of trade between the Chesapeake Defendants and the Anadarko Defendants, has the following effects: (i) competition for oil and gas leases was eliminated, suppressed, or materially reduced in the relevant geographic markets; (ii) lease signing bonuses and royalty rates were fixed, maintained or stabilized at artificially low levels in the relevant geographic markets; (iii) landowners and other owners of Gas Mineral Rights were deprived off free and open makets for their Gas Mineral Rights; and (iv) landowners and other owners of

Gas Mineral Rights in the relevant geographic market (including Plaintiffs or their respective predecessors in interest) received infra-competitive, artificially deflated and low prices for their respective Gas Mineral Rights, in the form of signing bonuses, royalty rates and less favorable lease terms.

216.   Prior to the end of 2011, in furtherance of the agreement, combination and conspiracy among Defendants, Chesapeake Appalachia obtained Gathering Services from other affiliates of Chesapeake, including CMD and/or AMS. By virtue of their unlawfully acquired effective monopoly on Gathering Services in the relevant geographic market, CMD and/or AMS were able to and did charge supra-competitive prices for such services. Chesapeake Appalachia and the other Lessee Defendants benefitted from such above-market prices by virtue of their shared ownership of the gathering systems, and by being able to effectively recover material portion of such charges by deducting a proportionate share of the charges from the royalties payable to Plaintiffs, causing injury to Plaintiffs.

217.   Prior to the CMO Acquisition, Chesapeake Energy, directly and through its controlled subsidiaries, possessed monopoly power in the market for natural gas gathering and midstream transportation services in the Exclusive Dedicated Acreage. Through the CMO Acquisition, and the new gathering agreements executed in connection with the transaction, Chesapeake Energy and its affiliates not only transferred its existing, unlawfully-acquired monopoly power to

Access Midstream and its affiliates, but also effectively bolstered and extended that monopoly power.

218.   By entering into and closing the CMO Acquisition, and the various contracts involved in that transaction, including the Marcellus Gathering Agreement, Defendants contracted, combined or conspired to further restrain competition in the relevant markets.

219.   Defendants took steps in furtherance of their contract, combination or conspiracy by, among other things, closing the CMO Acquisition, and by Access Midstream and its affiliates paying, and  Chesapeake Energy and its affiliates accepting and receiving, the agreed consideration, and by Access Midstream thereafter providing natural gas gathering systems and services, and related natural gas post-production services, to Chesapeake Energy and its affiliates, with respect to natural gas produced in the Exclusive Dedicated Acreage, at supra-competitive prices.

220.   In negotiating and entering into the CMO Acquisition, Chesapeake and Access Midstream acted with knowledge that the gathering and transportation costs that Chesapeake was committing to pay to Access Midstream or its affiliates were excessive, and that Chesapeake Energy and its affiliates intended to fund a material portion the ongoing supra-competitive cost of gathering and transportation services which they were committing to pay by effectively passing along a substantial portion

of such costs to the owners of royalty interests in natural gas wells operated by Chesapeake within the Exclusive Dedicated Acreage, including Plaintiffs, by deducting a portion of such costs in calculating the royalties payable to such royalty interest owners, and thereby reducing the amount of the royalties. Chesapeake Appalachia and the other Lessee Defendants have in fact effectively passed along to Plaintiffs and other royalty interest owners a significant portion of the supra-competitive costs of gathering and transportation services that the Chesapeake Defendants committed to pay in connection with the CMO Acquisition by deducting a portion of such costs in calculating the royalties payable Plaintiffs, thereby reducing the amount of the royalties paid to Plaintiffs.

221.   As lessors of natural gas rights and holders of royalty interests in natural gas produced and marketed within the Exclusive Dedicated acreage through the commercial exploitation of such rights, Plaintiffs were and are within the area of the economy endangered by the breakdown in competitive conditions resulting from the contracts or conspiracy between Defendants in restraint of trade.

222.   The economic injury suffered by Plaintiffs was a necessary step in, integral to, or part of the essential means by which Defendants sought to achieve their illegal and anticompetitive ends. As a result, the economic injury suffered by Plaintiffs is inextricably intertwined with Defendants' wrongdoing.

223. Plaintiffs have suffered antitrust injury as a result of Defendants' conduct because the economic harm they have suffered – the artificial depression of their initial lease signing bonuses, royalty rates and lease terms, and the subsequent loss of royalties due to deductions by the Lessee Defendants of unauthorized or artificially inflated costs for gathering, transportation and other post-production costs – reflects either (a) the anticompetitive impact of the antitrust violations by Defendants with respect to the market for Operating Rights and/or Gathering Services, or (b) the effect of anticompetitive acts in the markets for Operating Rights and/or Gathering Services which were made possible by, and reflect a further consequence and effect of, their earlier successful efforts to foreclose or eliminate competition in the market for Gas Mineral Rights. By engaging in market allocation in the market for Gas Mineral Rights, defendants Chesapeake and Anadarko E&P, which were horizontal competitors, enabled themselves to cause Plaintiffs to receive below-market royalties as a result of the deduction of unauthorized and/or artificially inflated costs from their royalties.

224. As a direct and proximate result of Defendants' past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and damages in amounts to be proven at trial.

225. Plaintiffs seek money damages from Defendants, jointly and severally, for these violations.

226.   The actual damages sustained by Plaintiffs should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

### SECOND CAUSE OF ACTION
### (Combination or Conspiracy to Monopolize Trade or Commerce In Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

227.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

228.   Plaintiffs assert this Second Cause of Action against, and all references to "Defendants" in this Second Cause of Action shall mean and refer to, defendants Chesapeake Energy, CEMI, Chesapeake Operating, Anadarko Petroleum, Access Midstream, Access Operating and Appalachia Midstream only.

229.    The relevant geographic market for purposes of this claim is, in the alternative: (a) Bradford County, Pennsylvania, and adjoining portions of Sullivan, Susquehanna and Wyoming Counties, Pennsylvania; and/or (b) the Exclusive Dedicated Acreage.

230.   The relevant product or service market for purposes of this claim is the market for Gathering Services. Gathering services are not reasonably interchangeable with other conceivable methods of transporting natural gas from wells to interstate pipelines. As a result, the estimated cross-elasticities of demand, supply and substitution for potential alternative services  is  low.

231.  By their respective conduct set forth above, Defendants willfully, knowingly and intentionally combined or conspired among themselves and with others with the specific intent to: allocate the market for  cause and permit Access Midstream to acquire, maintain, possesses and exercise monopoly power in the market for natural gas gathering systems and services, and for related natural gas post-production services, in the geographic market consisting of the Exclusive Dedicated Acreage, and to abuse that power to maintain and enhance its market dominance by knowingly causing, inducing and permitting Chesapeake to deliberately underpay royalties properly due and payable to owners of royalty interests, including Plaintiffs, on the proceeds received by Chesapeake at the point of sale from the sale of natural gas produced from the properties of such royalty owners, by the improper deduction of excessive, unwarranted and unreasonable costs before calculating the royalties payable on such proceeds, to enable Chesapeake to return to Access Midstream, and pay supra-competitive returns to Access Midstream on, the monies that it paid to Chesapeake.

232.  In furtherance of the combination or conspiracy, Defendants have committed one or more overt acts, including, but not limited to: defendants Chesapeake and Access Midstream closed the CMO Acquisition; Access Midstream and its affiliates paid, and Chesapeake Energy and its affiliates accepted and received, the agreed cash consideration for the CMO Acquisition; Access

Midstream, directly or through its subsidiaries and affiliates, has provided natural gas gathering systems and services, and related natural gas post-production services, to Chesapeake Energy and its affiliates, with respect to natural gas produced in the Exclusive Dedicated Acreage; and Chesapeake has paid Access Midstream or its affiliates the supra-competitive fees specified in the existing contracts transferred and the new contracts entered into as part of the CMO Acquisition for gas gathering and transportation services.

233. By charging and accepting supra-competitive fees for gathering services pursuant to its combination or conspiracy with Chesapeake, Access Midstream has abused its monopoly power for gathering and midstream transportation services in the Exclusive Dedicated Acreage.

234. Defendants' conduct described herein constitutes a per se violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In the alternative, the conduct violates Section 2 of the Sherman act by virtue of the rule of reason. Alternatively, because an observer with even a rudimentary understanding of economics could readily conclude that the arrangement in question could have an anticompetitive effect on customers and markets, the conduct at issue can and should appropriately be analyzed under the intermediate "quick look" rule. Under the "quick look rule", the conduct in question constitutes a violations Section 1 of the Sherman Act, 15 U.S.C. § 1.

235.   As a direct and proximate result of Defendants' past and continuing violation of Section 2 of the Sherman Act, as well as Defendants' other unlawful conduct, Plaintiffs have suffered injury and damages in amounts to be proven at trial. The injury and damages sustained by Plaintiffs include being deprived of the royalties properly due and payable to them on the proceeds received by Chesapeake at the point of sale from the sale of natural gas produced from Plaintiffs' respective properties, as a result of Chesapeake's improper deduction of excessive, unwarranted and unreasonable costs before calculating the royalties payable to Plaintiffs on such revenues, which resulted in Plaintiffs receiving royalties in amounts substantially less than they would have been in the absence of the violations alleged.

236.   Plaintiffs have suffered antitrust injury as a result of Defendants' conduct because the economic harm they have suffered – the loss of royalties due to deductions by the Lessee Defendants of unauthorized or artificially inflated costs for gathering, transportation and other post-production costs – reflects the anticompetitive impact of the antitrust violations by Defendants with respect to the market for Gathering Services,

237.   Plaintiffs seek money damages from Defendants, jointly and severally, for these violations.

238.   The actual damages sustained by Plaintiffs should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## THIRD CAUSE OF ACTION
## (Violation of RICO, 18 U.S.C. §§ 1961-1968)

239.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

240.   Plaintiffs assert this Third Cause of Action against, and all references to "Defendants" in this Third Cause of Action shall mean and refer to, defendants Chesapeake Energy and Access Midstream only.

241.   Plaintiffs and each of the Defendants are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### A.   The Enterprise

242.   For purposes of this claim, the RICO "enterprise" is an association in fact, as that term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Defendants, together with their respective officers, directors, employees and agents (the "Enterprise"). As such, the Enterprise is separate and distinct from the Persons that constituted the Enterprise.

243.   The Enterprise was primarily managed by Chesapeake, which organized the fraudulent scheme and procured the involvement of the other Defendants. Each of the Defendants, however, agreed to, and did, participate in the

conduct of the Enterprise, and carried out its role using broad and independent discretion.

244.   The companies and individuals that comprise the Enterprise were associated for the common purpose of concealing and disguising the fact that the falsely implying and seeking to lull Plaintiffs, other royalty interest owners, governmental officials and the public, into believing that the deductions for post-production costs reflected in the opaque and confusing royalty statements that the Lessee Defendants issued to Plaintiffs and other royalty interest owners were legitimate and contractually permissible under the terms of the applicable leases, when they in fact were not, to enable the which one or more of the Defendants held working interests, and underpaying the royalties due under such leases, thereby enabling the Lessee Defendants to avoid or delay scrutiny while they continued to fail to pay the full and correct royalties due and owing to Plaintiffs and others.

245.   At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce in that their gas gathering and transportation charges and deductions have reduced oil and gas royalty payments to lessors throughout the United States, and have been directed against lessors throughout the Commonwealth of Pennsylvania and other states. Further, the Gas Gathering Agreements and other non-arm's length agreements entered into by Chesapeake Appalachia and its co-

conspirators, govern assets and employees located throughout the United States, and prescribe payments to be sent throughout the United States.

246.   The Enterprise has operated since at least 2010, and its operation is ongoing.

247.   The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

### B.   The Pattern of Racketeering Activity

248.   At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of the Enterprise, and participated in the operation and management thereof, through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §§ 1961(1) and (5), through conduct including but not limited to the following:

a.   Defendant Chesapeake Energy knowingly and intentionally caused and permitted its direct and indirect subsidiaries to pass-on and charge to Plaintiffs and other leaseholders, and the Lessee Defendants charged and deducted from the royalties payable to Plaintiffs and other leaseholders, artificially inflated gathering fees, which thereby improperly reduced the royalties otherwise payable to Plaintiffs and such other leaseholders, despite the  knowledge that the underlying gathering and transportation fees charged by Access Midstream, including under the

Marcellus Gathering Agreements, were far in excess of the fair market rates of such fees;

b.     Defendant Access Midstream agreed, and the other Defendants knew that Access Midstream had agreed, to rebate a portion of the artificially inflated fees to Chesapeake and/or its subsidiaries and affiliates, ostensibly for the use of other equipment and services;

c.     Defendants also knew and expressly or implicitly agreed, that such artificially inflated gathering and transportation fees would be passed-on to holders of royalty interests in leases with the Lessee Defendants, including Plaintiffs, in the form of deductions from the royalties payable to them;

d.     The unlawful conduct by Defendants through the association-in-fact Enterprise, was intended to and did operate to falsely imply and lull Plaintiffs, other royalty interest owners, governmental officials and the public, into believing that the artificially inflated deductions for post-production costs reflected in the labyrinthine, opaque and confusing royalty statements issued to Plaintiffs and other royalty interest owners, were legitimate and contractually permissible under the terms of the applicable leases, when they in fact were not, and to thereby enable the Defendants to avoid or delay scrutiny while they continued to deprive Plaintiffs of their rightful royalty payments.

249.    Plaintiffs were among the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the Defendants, and suffered financial harm as the direct and intended consequence and result of such conduct.

250.    The unlawful activity by Defendants described in this cause of action was continuous and open-ended.

### C.    The Predicate Acts of Mail Fraud and Wire Fraud

251.    The pattern of racketeering activity in which Defendants engaged consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud Plaintiffs and other owners of royalty interests under oil and gas leases with the Lessee Defendants, in order to obtain their money or property through false or fraudulent pretenses, representations or promises.

252.    It was reasonably foreseeable to the Defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

253.    The nature, pervasiveness and duration of the Enterprise necessarily entailed frequent mail and/or wire transmissions. The specific dates and contents of such transmissions are within the peculiar knowledge of Defendants, and connect be alleged by Plaintiffs without access to the books and records of the Defendants.

Plaintiffs nonetheless can and do allege such transmission generally, and specifically with reference to their own periodic royalty statements and payments.

254.   For the purpose of executing and furthering the scheme, the Defendants regularly transmitted and caused to be transmitted by means of wire communications in interstate commerce writings, electronic date, and funds, to and among themselves, Plaintiffs and others, and also regularly caused matters and things to be placed in post offices or authorized depositories, or caused to be deposited matters or things to be sent or delivered by private or commercial interstate carrier. By so doing, Defendants utilized the mails and/or wires for purposes of furthering and executing the scheme.

255.   Each royalty statement issued to each of the Plaintiffs, and the other electronic and postal transmissions alleged above, was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each Plaintiff.

256.   In addition, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud, in that each transmission furthered and executed the scheme to defraud Plaintiffs and other royalty interest owners. Defendants each participated in the scheme to defraud knowingly, willfully, and with the specific intent to defraud royalty interest owners, including Plaintiffs, to

accept royalties in amounts less than that to which they were entitled, as a result of the deduction of unauthorized or falsely inflated post-production costs.

257.   The foregoing predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but were related and recurring acts aimed and the common purpose and goal of defrauding royalty interest owners, including Plaintiffs, to accept royalties in amounts less than that to which they were entitled, as a result of the deduction of unauthorized or falsely inflated post-production costs, and thereby enable Defendants to reap illicit profits.

258.   Defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and other royalty interest owners.

### D.   RICO Injury to Plaintiffs

259.   As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs were injured by the loss of royalties to which they otherwise were entitled as a result of Defendants' deduction of unauthorized or artificially inflated and unreasonable post-production gathering and transportation costs in the calculation and payment of such royalties to Plaintiffs. The injuries that have been sustained by Plaintiffs are a direct, proximate and

foreseeable result of the scheme alleged. Plaintiffs' continued acceptance of underpayment royalties as a result of the deduction of such unauthorized or artificially inflated and unreasonable costs in the calculation of their royalties evidences their reliance on Defendants' fraudulent misrepresentations and omissions.

260. The overcharges for gathering and transportation fees, and resulting underpayment in royalties, to Plaintiffs was an integral and necessary part of the scheme, as they enabled Defendants to profit from their respective interests in Access Midstream and Appalachia Midstream Service (in the case of Chesapeake), and in the shared ownership of the gathering pipelines (in the case of other Defendants, and later enabled Chesapeake to fulfill the payment obligations that it incurred to Access Midstream in connection with the CMO Transaction, and the other Defendants to acquiesce in and profit from such payments (through their continued common ownership interests in the gathering pipelines).

261. Pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages they have sustained, together with reasonable attorney's fees and costs.

**FOURTH CAUSE OF ACTION**
**(Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))**

262. Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

263.   Plaintiffs assert this Fourth Cause of Action against, and all references to "Defendants" in this Fourth Cause of Action shall mean and refer to, defendants Chesapeake Energy, CEMI, Chesapeake Operating, Access Midstream, Access Operating and Appalachia Midstream only.

264.   RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section"

265.   The Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

266.   Defendants formed and conducted the affairs of the association-in-fact Enterprise for the common purpose of fraudulently deducting unauthorized or artificially inflated and unreasonable post-production gathering and transportation costs in the calculation and payment of royalties to Plaintiffs and other royalty interest owners, and thereby fraudulently and improperly justifying the underpayment of royalties to Plaintiffs and such other royalty interest owners.

267.   The Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

268.   As set forth above, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern

of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of

18 U.S.C. § 1962(c).

269.   Each of the Defendants was associated with the Enterprise and agreed

and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate

in the affairs of the Enterprise through a pattern of racketeering activity in violation

of 18 U.S.C. § 1962(c).

270.   Each of the Defendants committed or caused to be committed a series

of overt acts in furtherance of the conspiracy and to accomplish the objects thereof,

including but not limited to the acts set forth herein.

271.   As a direct and proximate result of the overt acts and predicate acts of

the respective Defendants in furtherance of the violation of 18 U.S.C. § 1962(d) by

conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to

be injured in their business and property in amounts to be determined at trial. Such

injuries include, but are not limited to, the loss of royalties to which they otherwise

were entitled as a result of Defendants' deduction of unauthorized or artificially

inflated and unreasonable post-production gathering and transportation costs in the

calculation and payment of such royalties to Plaintiffs.

272.   Pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally

liable to Plaintiffs for three times the damages they have sustained, together with

reasonable attorney's fees and costs.

## FIFTH CAUSE OF ACTION
### (Conversion)

273.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

274.   Plaintiffs assert this Fifth Cause of Action against, and all references to "Defendants" in this Fifth Cause of Action shall mean and refer to, defendants Chesapeake Energy and Access Midstream only.

275.   By and through their respective actions set forth above, Defendants wrongfully and intentionally caused unauthorized or artificially inflated and unreasonable deductions to be taken from royalties otherwise payable to Plaintiffs.

276.   Plaintiffs were entitled to receive the wrongfully deducted amounts pursuant to their leases.

277.   As alleged above, Defendants collected the amounts wrongfully deducted from Plaintiffs royalties through agreements between affiliates of Chesapeake and Access Midstream that resulted in the charges being assessed against Plaintiffs' royalties by the respective Lessee Defendants.

278.   Defendants have retained these funds unlawfully and without the consent of Plaintiffs, and have deprived Plaintiffs from exercising control over these funds, which belong to Plaintiffs.

279.   Defendants intend to permanently deprive Plaintiffs of these funds.

280.   The funds which have been taken and retained by Defendants are specific and readily identifiable pursuant to royalty statements largely in the control of the Lessee Defendants.

281.   The funds taken and retained by the Lessee Defendants were ultimately received and retained by their respective parent companies and other Defendants herein as part of the coordinated conduct alleged herein.

282.   As a direct and proximate result of Defendants' wrongful conversion, Plaintiffs have suffered and continue to suffer damages.

283.   Plaintiffs are entitled to recover from Defendants all damages and costs permitted, including all amounts wrongfully converted, which are specific and readily identifiable

284.   In wrongfully converting Plaintiffs' funds, Defendants and each of them have acted, and are continuing to act, intentionally, willfully, outrageously and in conscious disregard of the rights and interests of Plaintiffs, entitling Plaintiffs to recover, in addition to compensatory damages, punitive and exemplary damages, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy)

285.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

286.   Plaintiffs assert this Sixth Cause of Action against, and all references to "Defendants" in this Sixth Cause of Action shall mean and refer to, defendants Chesapeake Energy and Access Midstream only.

287.   By engaging in the actions set forth above, defendants Chesapeake Energy, CEMI, and Chesapeake Operating, and each of them, acting with the intent to injure Plaintiffs and other Lessor Royalty  Owners, and without privilege or justification to do so, wrongfully agreed, combined and conspired with each other and with third parties to make wrongful deduction from Plaintiffs' royalties and to thereby deprive Plaintiffs of the royalties which they were and are entitled to receive under the respective Leases under which they hold royalty interests by causing, enabling, inducing and permitting the respective Lessee Defendants to take or give effect to impermissible, or otherwise arbitrary, excessive and unreasonable, deductions for purported post-production costs in calculating the royalties payable to Plaintiffs, and have taken, and are continuing to take, actions in furtherance of such agreement, combination and conspiracy.

288.   Defendants have formed and operated a civil conspiracy with each other to convert Plaintiffs' property, performing as part of the conspiracy numerous

overt act in furtherance of the common design, including one or more unlawful acts which were performed to accomplish a lawful goal, or, in the alternative, one or more lawful acts which were performed to accomplish an unlawful goal.

289.   Defendants intended to injure Plaintiffs, and succeeded in injuring Plaintiffs, to the extent of the wrongful deductions alleged herein, without legal justification.

290.   As a direct and proximate result of wrongful agreement, combination and conspiracy by and among the Defendants, and the actions taken by them in furtherance of the agreement, combination and conspiracy, Plaintiffs have been harmed, and continue to be harmed, by the loss and underpayment of royalties to which they were and are otherwise contractually entitled pursuant to their respective leases or assigned rights.

291.   In wrongfully agreeing, combining and conspiring to deprive Plaintiffs of the royalties to which they are contractually entitled, and in taking actions in furtherance of such agreement, combination and conspiracy, as set forth above, Defendants and each of them have acted, and are continuing to act, intentionally, willfully, outrageously and in conscious disregard of the rights and interests of Plaintiffs, entitling Plaintiffs to recover, in addition to compensatory damages, punitive and exemplary damages, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract – Oil and Gas Lease)

292.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

293.   Each of the respective Plaintiffs asserts this Seventh Cause of Action against, and all references to "Defendants" in this Seventh Cause of Action shall mean and refer to, only those Lessee Defendants which hold, or at any time have held, working interests in such Plaintiff's Lease, as direct or indirect assignees of the original lessee, Anadarko E&P or T.S.Calkins.

294.   Each of the Leases expressly provides that "LESSEE shall have the right to assign this Lease or any interest therein, and the assignee of LESSEE shall have corresponding rights, privileges and obligations with respect thereto. All terms, conditions and covenants between the parties hereto shall extend to their respective heirs, successors, personal representatives and assigns."

295.   By acquiring and accepting interests in the Leases, either directly or by direct or indirect assignment from Anadarko E&P, each of the other Lessee Defendants (Chesapeake Appalachia and Mitsui E&P) became bound by the duties and liabilities of the Lessee, to the extent of the interest acquired.

296.   Plaintiffs are the proper parties to sue to enforce the terms of the respective Leases under which they hold their royalty interests, either as the original

110

Lessor party to such Leases or as successor to the rights and interests of the original Lessor party, by deed, devise, inheritance or assignment.

297.    Plaintiffs have performed, or have substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under their respective Leases and the related assignments. Plaintiffs are, and have been, entitled to performance by the Lessee Defendants of their covenants, duties, obligations under their respective Leases and the related assignments.

298.    The Lessee Defendants had and continue to have an affirmative duty to timely pay the respective Plaintiffs the full, true and correct royalty due to them under the terms of the Leases under which they hold their respective royalty interests.

299.    The Lessee Defendants were and are required to pay Plaintiffs royalties on all gas produced from the premises and sold, based on the "market value at the well" of one-eighth (1/8th) (or such other fractional amount or percentage as is specified in a particular Plaintiff's Lease) of the gas sold, or, in the alternative, with respect to all gas produced from premises which have been pooled or unitized, such proportion of the specified royalty as the acreage in the Plaintiff's leasehold premises included in such unit bear to the total acreage included in the unit.

300.    Each of the Leases includes an implied duty on the part of Chesapeake Appalachia, as the original Lessee, and each of the other Lessee

Defendants that holds a working interest in that Lease, as a direct or indirect assignee of Chesapeake Appalachia, to operate all wells drilled pursuant to the Leases for the mutual benefit of both the lessor and the lessee, which includes an implied covenant to market the gas produced from the leasehold property.

301.    As a result of the implied covenant to market, each of the Lessee Defendants was and is subject to an implied duty to market the gas produced from each of the leasehold properties (or from the respective units into which such leasehold properties have been pooled) in which it held working interests.

302.    The implied duty to market owed by the respective Lessee Defendants encompasses and includes (a) a duty to find a market, by diligently connecting discovered gas reserves to a viable economic market, (b) a duty to get the best price reasonably available for the gas produced, and (c) a duty to bear the cost of transforming the gas into marketable form, meaning not only in a physical condition such that it is acceptable to be bought and sold in a commercial marketplace, but also in a geographic location where an commercial market actually exists for the gas to be sold.

303.    Because the Lessee Defendants have a duty to market the natural gas produced from each of the leasehold properties in which the respective Plaintiffs hold royalty interests, or from the drilling and production units in which they are included, the Lessee Defendants were and are inherently responsible to pay all costs

112

necessary to satisfy that duty with respect to each Lease, unless the Lease expressly provides otherwise, which they do not do.

304.   No bona fide commercial market exists for the gas produced from the properties subject to the Leases at the well, on the leasehold premises, or on the properties that comprise the unit(s) of which the leasehold premises are a part. As a result, the gas produced from the leasehold premises was not in marketable form at the well, on the leasehold property, or on the unit of which the leasehold property was a part, and had to be gathered, stored, and transported to market locations.

305.   Under the terms of the Leases, the Lessee Defendants were not and are not entitled to cause or permit any deductions to be taken, directly or indirectly, from the proceeds derived by the Lessee Defendants from the sale of gas in which the respective Plaintiffs hold royalty interests, or from the royalties payable to Plaintiff, for the costs of gathering, storing, separating, treating, dehydrating, compressing, processing, transporting or marketing the gas, or for any other post-production costs required to make the gas marketable.

306.   In material breach of their respective obligations under the terms of the Leases, the respective Lessee Defendants have deducted, or caused and permitted their respective affiliated marketing agents to deduct, from the amounts realized by the Lessee Defendants from the sale of gas produced from the applicable premises, or from royalties payable to Plaintiffs, and continue to deduct or cause and permit

their respective affiliated marketing agents to deduct, purported costs of gathering, storing, compressing, transporting and/or or marketing gas in which Plaintiffs hold royalty interests, in calculating the royalties payable to Plaintiffs. As a result, each of the Lessee Defendants has improperly failed to pay, or materially underpaid, the royalties due and owing to each of the Plaintiffs under the terms of their respective Leases.

307.    In the alternative, if and to the extent the Court finds that the Lessee Defendants were entitled to deduct any post-production costs in calculating the royalties payable to Plaintiffs, any and all such costs implicitly and necessarily would be limited to a pro rata share of the actual and reasonable charges paid by the Lessee Defendants for bona fide post-production services.

308.   In addition, or in the alternative, to breaching their express or implied obligations under the Leases, the Lessee Defendants have materially breached their respective implied covenants of good faith and fair dealing inherent in the Leases. The Lessee Defendants breached their implied covenant of good faith and fair dealing: (a) by selling the gas produced pursuant to the Leases at artificial, self-serving and unreasonably low prices, rather than at the highest price reasonably obtainable at the time of production; and/or (b) by deducting from the amount realized by the Lessee Defendants from the sale of gas produced from the leasehold premises, or from Plaintiffs' royalties, or otherwise imposing, giving effect to or

passing-along, arbitrary, capricious, artificially inflated, grossly excessive, improper and unreasonable charges for gas gathering, transportation and other post-production services, and as a result improperly reducing the royalties payable and actually paid to Plaintiffs under their Leases.

309.   As a direct, proximate and foreseeable result of the foregoing material breaches by the Lessee Defendants of their respective express and/or implied contractual obligations under the terms of the respective Plaintiffs' Leases, singularly and/or in any combination thereof, Plaintiffs have suffered financial injuries for which Plaintiffs are entitled to recover their respective expectation-interest damages, consequential and incidental damages, lost profits, out-of-pocket losses, and future damages.

310.   Plaintiffs believe and aver that the relevant terms of the Leases at issue, including the absence of any language permitting the deduction of post-production costs, clearly and unambiguously establish their rights to royalties, and the obligations of the Lessee Defendants to pay royalties, without the deduction of post-production costs, and support the claim for breach of contract described in the preceding paragraphs.

311.   In the alternative, Plaintiffs believe and aver that, in light of the facts and circumstances existing at the time the Leases were executed, including in particular the absence of any commercial market at the well for the gas produced

from the leasehold premises: (a) the relevant and material language and terms used in the royalty provision of the Leases, including but not limited to the terms "market value at the well", the "amount realized by Lessee" for production "computed at the well", and "fees levied upon LESSOR's royalty share" are ambiguous as a matter of law; (b) the ambiguous language can and should be construed against Anadarko E&P, as the drafter of the Leases, and the other Lessee Defendants as its assignees; (c) so construed, the ambiguous language is ineffective to permit the Lessee Defendants to deduct from the amount realized by them from the sale of gas produced from the leasehold premises, or from Plaintiffs' royalties, any share of the post-production costs incurred to make the gas marketable.

## EIGHTH CAUSE OF ACTION
### (Action for Accounting)

312.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

313.    Each of the Lessee Defendants has received, and continues to receive, monies in connection with sale of natural gas produced and marketed from the leased premises, in which Plaintiffs hold royalty interests under the terms of their respective leases.

314.   The nature of the relationships created by the leases to which the respective Plaintiffs are parties imposes a legal obligation upon each of the Lessee Defendants which holds a working interest in such leases to account to the respective

Plaintiffs for the monies received by or on behalf of such Defendants from the sale of natural gas produced and marketed from the leased premises.

315.   As a matter of law, each of the Plaintiffs is entitled to an accounting from each of the Lessee Defendants that holds a working interest in the Plaintiff's lease for the monies received by such Defendants from the sale of natural gas produced and marketed from the leased premises.

316.   In the alternative, each of the Plaintiffs is entitled to an equitable accounting from Chesapeake Appalachia and from each of the other Lessee Defendants, because the accounts involved in the calculation of the royalties payable to Plaintiffs are inherently complicated, and because the Lessee Defendants have failed to account for the purported post-production gathering and transportation costs which they have deducted, or threatened to deduct, in calculating the royalties payable to Plaintiffs. As a result, each of the Plaintiffs is entitled to an equitable accounting.

## NINTH CAUSE OF ACTION
### (Unjust Enrichment)

317.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

318.   Plaintiffs assert this Ninth Cause of Action against, and all references to "Defendants" in this Ninth Cause of Action shall mean and refer to, defendants

Chesapeake Energy, CEMI, Chesapeake Operating, Access Midstream, Access Operating and Appalachia Midstream only.

319.  As a result of the CMO Acquisition, the New Gas Gathering Agreements, and the resulting payment of billions of dollars to the Chesapeake Defendants, and the resulting deduction of excessive and artificially inflated post-production costs from Plaintiffs' royalties (or from gas revenues or proceeds in the calculation of such royalties), Plaintiffs have directly or indirectly conferred benefits on Defendants.

320.  Defendants have appreciated, accepted and retained such benefits under circumstances which would make it inequitable and unjust for Defendants to retain such benefits without payment of value to Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants, on all of their respective causes of action, granting the following relief:

A.  As to the First Cause of Action, for Violation of Section 1 of the Sherman Act, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against all of the Defendants, jointly and severally, including compensatory damages in such amounts as are determined at trial to have

been sustained by each of the respective Plaintiffs, and treble damages pursuant to 15 U.S.C. § 15(a), together with costs of suit, including reasonable attorneys' fees;

B.    As to the Second Cause of Action, for Violation of Section 2 of the Sherman Act, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against the Defendants named in such cause of action, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

C.    As to the Third and Fourth Causes of Action, for violation of RICO, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against the Defendants named in each such cause of action, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

D.    As to the Fifth Cause of Action, for conversion, an award of monetary damages, as allowed by law, in favor of each of the Plaintiffs and against the Defendants therein named, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the

119

respective Plaintiffs, as well as punitive damages, in amounts determined to be just and proper, together with costs of suit;

E.     As to the Sixth Cause of Action, for civil conspiracy, an award of monetary damages, as allowed by law, in favor of each of the Plaintiffs and against the Defendants therein named, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, as well as punitive damages, in amounts determined to be just and proper, together with costs of suit;

321.     As to the Seventh Cause of Action, for breach of contract,  awards of compensatory damages in favor of the respective Plaintiffs and against the respective Lessee Defendants, as applicable, in such amounts as are determined to have been sustained by each of the respective Plaintiffs as a result of the breach of the royalty provisions of their respective Leases;

F.     As to the Eighth Cause of Action, for an accounting, an accounting as described above;

G.     As to the Ninth Cause of Action, for unjust enrichment, an award requiring the Defendants named therein to disgorge the amounts by which they have been unjustly enriched at the expense of the Plaintiffs;

H.     As to all monetary damages awarded, an award to Plaintiffs and against the applicable Defendants of pre- and post-judgment interest on the amount(s) of the monetary damages awarded; and

I.     Granting such other and further relief as may be deemed necessary or appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all of their respective claims and issues in this action that are triable of right by a jury.

Dated: June 28, 2016   Respectfully submitted,

        /s/ *Thomas S. McNamara*
        Thomas S. McNamara
        Attorney ID #38479
        INDIK & McNAMARA, P.C.
        100 South Broad Street, Suite 2230
        Philadelphia, PA  19110
        T:  (215) 567-7125

        Christopher D. Jones
        Attorney I.D. # 84049
        GRIFFIN, DAWSEY, DePAOLA & JONES, P.C.
        101 Main Street
        Towanda, PA  18848
        Tel: (570) 265-2175

        -and-

        Taunya M. Knolles Rosenbloom
        Attorney ID # 200635
        LAW OFFICES OF TAUNYA M. KNOLLES
        ROSENBLOOM
        332 South Main Street, P.O. Box 309
        Athens, PA  18810
        Tel: (570) 888-0660

        *Attorneys for Plaintiffs*

# EXHIBIT A

# The Economic Impact of Marcellus Shale in Bradford and Tioga Counties, Pennsylvania

## By

## Representative Matt Baker

## 68th District

# Northern Tier Drilling



Chesapeake Energy is the red wells